## DURKEE FAMOUS FOODS, Inc., v. HARRISON, Collector of Internal Revenue (two cases).

### Nos. 1921, 47306.

District Court, N. D. Illinois, E. D.
May 28, 1942.

Robert W. Childs, William Bourland, and Bobb, Spoerri, Bourland & Harris, all of Chicago, Ill., and Roger Hinds, of New York City, for plaintiff.

J. Albert Woll, U. S. Dist. Atty., of Chicago, Ill., for defendant.

SULLIVAN, District Judge.

Pursuant to order of this court entered December 10th, 1941, this is a consolidation of cases Nos. 1921 and 47306, both brought for the recovery of taxes alleged to have been erroneously paid with respect to the processing of certain oils under Section 602½ of the Revenue Act of 1934, as amended in 1936, 26 U.S.C.A. Int.Rev.Acts, page 779. The cases were heard by the court without a jury.

At the trial it was agreed that the evidence should be limited to the question whether plaintiff is prima facie entitled to recover in any amount, and that the computation of the amount of the judgment to be entered, if such computation is necessary, should await a decision upon the legal questions involved.

The complaint in case No. 1921 (in which bill of particulars was filed at the time of trial) originally sought in Count One the refund of $93,259.63, alleged to have been collected in excess of the amount actually due upon the processing of certain oils during the period from May, 1934, to January, 1936, inclusive, together with interest from the several dates of payment. The amount of the claimed refund has, by amendment, been reduced to $90,598.98, first, by the elimination of refunds claimed for taxes which arose in the months of May and June, 1934, and were paid in June and July, 1934, and against which it is agreed the statute of limitations had run prior to the filing of the claim; and secondly, by reason of certain credits, the exact amount. of which is still in dispute.

The complaint further sets out that claim for refund was filed on August 1st, 1938, and that on November 25th, 1938, said claim was rejected in its entirety by the Commissioner of Internal Revenue.

The complaint further alleges that on November 29th, 1939, plaintiff filed a new claim for refund in the sum of $21,895.12, being for that portion of taxes which were paid from November 30th, 1935, to February 28th, 1936, including to the extent of $16,048.72 a portion of the payments alleged in Count Two to have been excessive.

On January 30th, 1940, plaintiff applied for a reconsideration of that portion of the claim of August 1st, 1938, rejected on November 25th, 1938, relating to processing taxes paid prior to November 30th, 1935. On April 13, 1940, after reconsideration of the claim for $93,259.63, as amended, the same was again rejected, as was also the claim in the sum of $21,895.12 filed on November 29th, 1939.

Count One of the complaint in case No. 1921 alleges that of the total amount of material upon which processing taxes were paid, a certain amount consisted of water, fibre, hair, threads, bran, sand, hulls, meal, wax, alcohol and other non-oleaginous, inert, unsaponifiable substances, which was not oil, and could not be used in the production of any article intended for sale, and could not be put to any use whatever.

Count Two alleges that of the total amount of materials upon which processing taxes were paid, a certain amount consisted of oil, fatty acids, glycerol and coloring matter, none of which could be or was used in the manufacture or production of any article intended for sale, and all of which was lost in refining, and none of which could be recovered or put to any use.

Count Three sets up an alternative ground of recovery as to a portion of the. taxes referred to in Counts One and Two. It alleges that the article in the production of which all of the material involved in this suit was used was refined oil; that while a portion of the refined oil was intended for sale, another portion was intended by plaintiff for further manufacture of other articles intended for sale, and which use in the further manufacture was in reality the first domestic processing thereof as defined in the statute. That the water and other extraneous matter referred to in Count One, and the oil lost in refining, referred to in Count Two, had been removed before the refined oil was used in the manufacture of the article intended for sale, and therefore said substances did not enter into that taxable first domestic processing at all in any way.

Defendant, in its answer in case No. 1921, admits the payment of the taxes and the filing and rejection of the claim for refund, but otherwise denies the allegations of the complaint.

In case No. 47306 the facts have been stipulated, so there is no dispute concerning them. The complaint sets out that on May 10th, 1934, when the Revenue Act of 1934 became effective, plaintiff had on hand in the United States 2,563,303 pounds of coconut oil, sunflower oil and sesame oil, all of which, prior to that time, had been subjected in the United States to one or more of the following proceedings: Neutralizing, refining, bleaching, deodorizing or hydrogenating. Between May 10th, 1934, and December 1st, 1935, plaintiff further processed or used the said oils in the manufacture or production of an article intended for sale, and with respect to such further processing or usage paid to defendant, under protest, taxes in the aggregate amount of $76,899.09 at various dates from July 31st, 1934, to December 31st, 1935, which it now seeks to recover, together with interest from the various dates of payment. Claim for this refund was filed on November 1st, 1937, with the Commissioner of Internal Revenue, and by him rejected in full on January 19th, 1938.

The applicable statute, as it existed during the period here involved (July 31st, 1934, to February 28th, 1936,) is Section 602½ of the Revenue Act of 1934, as amended by Section 702 of the Revenue Act of

1936, 49 Stat. 1742, which, so far as here material, provides as follows:

"(a) There is hereby imposed upon the first domestic processing of coconut oil, palm oil, palm-kernel oil, fatty acids derived from any of the foregoing oils * * * a tax of 3 cents per pound to be paid by the processor * * *. There is hereby imposed (in addition to the tax imposed by the preceding sentence) a tax of 2 cents per pound, to be paid by the processor, upon the first domestic processing of coconut oil or of any combination or mixture containing a substantial quantity of coconut oil with respect to which oil there has been no previous first domestic processing, except that the tax imposed by this sentence shall not apply when it is established * * * that such coconut oil * * * is wholly the production of the Philippine Islands or any other possession of the United States * * *. For the purposes of this section the term 'first domestic processing' means the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed * * *."

The applicable regulations, so far as here material, are as follows:

"Reg. 48, Art. 1. (As amended by T.D. 4695, Sept. 1, 1936.)

"Definitions.—When used in these regulations, the term—* * *

"(h) *Fatty acids,* for the purposes of this Act, are those organic acids found in the free or combined state in coconut oil, palm oil, or palm kernel oil.

"(j) * * * An article is made from an oil or oils when the oil or oils, or any of their processed forms, have been used in making the article.

"(l) *Processing* means the use of the oil or oils in the manufacture or production of an article intended for sale.

"(m) *Use* has a very broad meaning. The term includes, among other things, the using or making use of, or employing, any one or more of the oils, or any combination or mixture of the oils, in any process, or stage or step in the manufacture or production of such article in its entirety, whether such oil is used as a component or constituent or ingredient of the article, or is used merely as a means or aid in the manufacture or production of the article, and not as a component or constitu-

ent or ingredient. Examples which are in no measure all inclusive of the *use* contemplated are:

"(1) Bleaching, neutralizing, refining, deodorizing, hydrogenating, sulphonating, 'twitchellizing', polymerizing, saponifying, or any other commercial processing or any combination of these commercial processings, if such process or combination of processes produces an article intended for sale.

"(2) The entire process of manufacture or production of an article intended for sale, where any one or more of the above enumerated processes are but incidental steps or stages in a continuous course of manufacture or production of the article.

"(3) The manufacture or production of an article intended for sale from an oil or oils upon which any of the processes enumerated in (1) above, have been performed either (A) prior to the importation of the particular oil, or (B) prior to the effective date of the Act.

"(4) The use of the oil or oils in connection with any process or stage of the manufacture or production of an article intended for sale, even though the oil is not consumed therein or does not become a component part of the article so produced. But such a use of the palm oil, by the processor, in the manufacture of tin plate is specifically excepted by the Act.

"(n) First domestic processing means the first use in the United States on or after the effective date of the Act. At all times in these regulations the term *processing* or *first domestic processing* will be deemed to be synonymous with 'use' or 'first use in the United States on or after the effective date,' respectively, and will include the meanings implied in the latter terms by subdivision (m) above."

"Reg. 48, Art. 2. (As amended by T.D. 4695, Sept. 1, 1936.) Nature of the Tax. The tax is an excise, not a property tax. It is laid not upon the oils as such, or upon the sale of such oils, but only upon their *use* in the manufacture of an article intended for sale.

"Reg. 48, Art. 5. (As amended by T.D. 4695, Sept. 1, 1936.) Measure of the Tax. (a) Generally. The measure of the tax is the quantity of oil or oils (in pounds) put into process, that is, the amount of tax will be determined by the quantity of the oil or oils which, in any way, enters into the first domestic processing."

The first question presented in case No. 1921 is whether the tax imposed by Section 602½ of the Revenue Act of 1934, as amended in 1936, should be measured upon the quantity of crude oil which enters into the neutralizing process, including the extraneous matter which is customarily associated with the oil at this stage; or whether the tax should be measured only upon the quantity of oil, less that part of the extraneous matter which is removed during the neutralizing process.

The question involved is a new one, being raised here for the first time, and counsel have consequently been unable to furnish any authorities in point, and my own independent research has revealed none. The court, therefore, has nothing to guide it save only the general principles of statutory construction. I am mindful of the re-enactment, by way of amendment, of the statute in question, and that where there is doubt or ambiguity in the statutory language, and there has been a departmental construction of the same by way of executive regulation, and Congress then re-enacts the statute, courts will, as a general rule, consider this an adoption by Congress of the construction put upon the ambiguous language by such regulation. That, however, is not the case here, for while Congress did re-enact this statute, it was not to clear up any doubt as to the meaning of the statute, raised by controverted cases, but quite apparently was for the purpose of adding to the taxable list the free fatty acids and salt which had theretofore not been taxed.

Under the statute of 1934 a tax is imposed upon the first domestic processing of certain named oils, and by the amendment of 1936 is now also expressly imposed on the fatty acids derived therefrom, which fatty acids are substantially removed from the oil during the first or neutralizing process. These free fatty acids on which the tax is imposed are customarily associated with and present in the crude oil, but are to be distinguished from the free fatty acids which are combined with the oil molecules and actually form a part of the oil. It is agreed that crude coconut oil, palm kernel oil and sesame oil customarily contain these free fatty acids, as well as certain extraneous matter such as dirt, water, fibre, etc., known as the M.I.U. content, which extraneous matter is eliminated during the first processing and is never put to any use. There are at least three methods by which the extraneous matter may be eliminated or removed from the crude oil. First, it may be settled out by gravity to the bottom of the tank. Second, it may be filtered out or clarified with bone char, fuller's earth, or similar clarifying agents, before the first or neutralizing step is taken in the refining process. When the extraneous matter is removed by either of these methods, there is no question of any tax being involved. Processors of oil have developed a third method whereby the extraneous matter is settled out rapidly and inexpensively, during the neutralizing process, by the addition of caustic soda to the crude oil. The free fatty acids combine with the caustic soda to form soap, and all of the extraneous matter is caught up with the soap and settled out. The result is obtained as an incident to the neutralizing process, and obviates waiting for the extraneous matter to settle to the bottom of the storage tank, or the equally slow method of filtering or clarifying permitted under S.T. 808, XIV-1 Cum.Bull. 396, the ruling announced by the Treasury Department in 1935, which provided that the elimination of dirt from crude oil by filtering or clarifying with bone char or fuller's earth, or similar agents, was not a taxable processing of the oil under the statute. This ruling revoked two previous rulings, and provides:

"In S.T. 758 it was held that the elimination of dirt from crude coconut oil by a cleansing process involving the use of any of the above mentioned agents (bone char, fuller's earth, etc.) * * * constitutes 'the first domestic processing' of the crude coconut oil under Sec. 602½ * * *. Upon reconsideration it is now held that the filtering or clarifying of crude coconut oil by the use of the above-mentioned agents does not 'constitute the first domestic processing' of crude oil within the meaning of Sec. 602½ of the Revenue Act of 1934, regardless of whether such filtering or clarifying is part of a continuous process of expressing coconut oil from copra within the United States, or is a distinct and separate process of treating crude coconut oil which was either imported into the United States or was previously expressed from copra in the United States. S.T. 758 and S.T. 800 are revoked."

This ruling has been in effect continuously since 1935, and while not conclusive is entitled to great weight in considering the interpretation of the statute here con-

cerned. Brewster v. Gage, 280 U.S. 327, 50 S.Ct. 115, 74 L.Ed. 457; United States v. Philbrick, 120 U.S. 52, 7 S.Ct. 413, 30 L.Ed. 559; United States v. Glidden Co., 6 Cir., 78 F.2d 639.

Under Article 5 of Regulation 48, the measure of the tax is the quantity of oil in pounds which enters into the first domestic processing. Plaintiff contends that the extraneous matter customarily associated with the crude oil, and removed during the neutralizing process, is not oil within the meaning of Section 602½ of the Revenue Act of 1934, and therefore should not be included within the measure of the tax. Defendant, on the other hand, insists that it is oil within the meaning of Section 602½ and should be included in the measure of the tax.

It is agreed that "crude oil" refers to an aggregate of oil plus various other extraneous substances which are not oil, but are customarily associated with the oil in its crude state. The term "crude oil" is nowhere used either in the statute or in the regulation, but is used in Ruling S.T. 808, supra, which provides for the elimination of dirt by the two cleansing methods. The tax is upon the "processing of the oil" not upon the oil itself, and the first step in the processing is neutralizing, which is accomplished by the addition of an alkali to the crude oil. The alkali and the free fatty acids combine to form a soap, and incidentally, during this process, the M.I.U. settles out with the soap. Without doubt this neutralizing operation constitutes a processing of the oil and the fatty acids, as that term is used in the Statute and in Regulation 48, but I fail to understand how the elimination of the M.I.U. constitutes a processing thereof, merely because such elimination is accomplished as an incident of the neutralizing process. I believe that the soap formed by the combination of the alkali and crude oil thereby becomes a cleansing agent which eliminates the dirt from the crude oil in the same manner as does the use of bone char or fuller's earth, except that it accomplishes the same result more expeditiously and more economically.

It is conceded that M.I.U. is extraneous waste matter. It is not oil and is never used at any time for any purpose. It is the same waste material which Treasury Ruling S.T. 808 provides may be eliminated from crude coconut oil by two designated methods, neither of which is considered a first "domestic processing within the meaning of Section 602½ of the Revenue Act of 1934, regardless of whether such filtering or clarifying is part of a continuous process * * * or is a distinct and separate process of treating coconut oil." The M.I.U. never is and never can be neutralized or processed, but always remains extraneous waste material, and is so recognized in the Treasury Ruling. The oil processors developed a third and more rapid and economical method of eliminating the M.I.U. from crude oil, whereby it is collected, eliminated and discarded during the neutralizing process. If it is waste material when eliminated by either of the two methods provided in Treasury Ruling S.T. 808, then it is just as certainly waste material when eliminated by the third method. If it is not to be included in the measure of tax when eliminated by the two methods provided in Treasury Ruling 808 for filtering and clarifying, then I do not believe it should be included in the measure of tax simply because it is eliminated by a different method for filtering and clarification which accomplishes the same result in less time and more economically. If Congress had intended that the tax should be assessed upon the oil plus the extraneous matter, I believe it would have used the term "crude oil" rather than coconut oil, palm oil, etc., as it did; just as I believe that if the Commissioner had intended to include the extraneous material in the measure of the tax, he would also have used the term "crude oil" rather than "oil" as it appears in Regulation 48 which defines the measure of the tax. Moreover, "processing" is defined in the Statute itself as meaning "the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed." It is nowhere suggested that M.I.U. is ever the subject of use of any kind, nor is it possible to subject it to any use, as that term is defined in either the Statute or the Regulation.

I am not impressed with defendant's contention that from a chemical standpoint the association of the oil molecules with the M.I.U. content and the free fatty acids constituting the crude oil, is a "combination or mixture" within the meaning of the Statute. The Statute provides:

"There is hereby imposed upon the first domestic processing of coconut oil, sesame oil, * * * or of any combination or mix-

ture containing a substantial quantity of any one or more of such oils * * * a tax, * * *."

I believe that "combination or mixture" as here used refers to a combination or mixture of oils, which combination or mixture contains a substantial quantity of one or more of such oils as are specifically named in the statute. The extraneous matter is never referred to as being mixed with the oil, but always as being associated with the crude oil.

I am of the opinion that in Case No. 1921 the plaintiff should recover under Count One.

■ The next question, presented by Count Two, is whether a processor who neutralizes, washes, bleaches and deodorizes oils with respect to which the tax is imposed by Section 602½ of the Revenue Act of 1934, as amended, and who, as required by the Act, has paid the tax with respect to the neutralizing process, is entitled to an allowance for oil customarily lost during the refining processes. Plaintiff admits that the material involved in Count Two is oil or fatty acids, and as such would have properly entered into the computation of the tax, provided it had been put to any use, but that it was lost during the various refining processes, and therefore was never put to any use, as that term is defined in the Statute.

The Statute provides that "for the purposes of this section the term 'first domestic processing' means the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed." Plaintiff urges that because the oil was lost during the various refining processes, it was consequently not used in the manufacture or production of any article of any kind. From the testimony it appeared that there is customarily a loss of oil during each of the four refining processes, and plaintiff here claims an allowance not only for oil lost during the first or neutralizing process, but also during the three subsequent processes. It must be kept in mind that the tax is upon the *first domestic processing,* not upon the oil itself, measured upon the quantity of oil put into process, not on the amount which comes out; and when the first domestic processing has taken place, the oil has then been used in the production of refined oil, which is an article intended for sale. If it had been the intention of Con-

gress to exclude from the tax any oil which was lost during the refining processes, I believe it would have so provided in plain terms, such as was done in taxing statutes which permit the taxpayer to secure a credit or refund for loss by evaporation or shrinkage, as on alcohol and gasoline.

I am of the opinion that plaintiff is not entitled to recover under Count Two.

■ The question presented by Count Three is whether, in the case of a processor who neutralizes, washes, bleaches and deodorizes the oils designated in Section 602½ of the Revenue Act of 1934; and who further processes the resulting refined oil, both in the preparation of food products and in the preparation of ingredients sold to other manufacturers of food products, the tax is imposed upon the neutralizing process or upon the process which first follows the deodorizing process.

Defendant contends that the neutralizing process constitutes the first use in the United States in the manufacture or production of an article intended for sale, and is therefore the taxable "first domestic processing" defined by the Statute.

The plaintiff engages in two distinct industries, the refining of oil, and the manufacture of oleomargarine from the refined oil. The tax here involved, as said before, is not upon the oil itself, but rather upon the process of refining, which process, of course, produces refined oil, an article intended for sale. Plaintiff argues that some of the oil resulting from the neutralizing process was intended for sale, but that some of it was intended for further manufacture. If it was the purpose of Congress to distinguish between the use of the oil in an article intended for sale, and one intended for further manufacture, it would have been easy to have made that distinction. Simply for its own advantage plaintiff owns and operates both refinery and manufacturing plant. Federal regulations require a physical separation of the two industries by a brick wall, with no common elevators, and an express restriction against anything save the manufacture of oleomargarine being carried on in the manufacting plant. Plaintiff's predecessor in the oleomargarine manufacturing business purchased from plaintiff the oil it required, just as plaintiff would be obliged to purchase its oil requirements from a refiner, if it did not itself operate a refinery. I do not believe plaintiff would seriously main-

tain that if it were engaged only in the refining business, it could carry on the process of refining oil ultimately intended for further manufacture, and not pay the tax imposed by the Statute on the first domestic processing; but rather pass the product on to the manufacturer and compel him to pay the tax on the process first following the deodorizing process, merely because at the time the oil was being refined it was intended for further use in the manufacture of food products. Plaintiff surely employs some bookkeeping or accounting methods whereby transfer is made of the refined oil from its refinery to its manufacturing plant.

The Treasury Regulation sets out nine different processings, and the statute designates the first of these or the neutralizing process which is to be taxed, and defines it as meaning the first use of the oil in the United States in the manufacture or production of an article intended for sale. If the article thus produced—the refined oil—is intended for further manufacture, it is transferred or sold by the refiner to the manufacturer, even though in fact the two activities are carried on by the same persons or firms. Otherwise the refiner would select the process which was to be taxed, according to the intended further use of the oil, without regard for the taxing statute; and it would always be necessary to make a distinction between refiners who were also manufacturers, and refiners who were not. For all refiners who were engaged solely in the business of refining, the tax would be upon the process which produced the refined oil; but for refiners who were also manufacturers, the tax would be upon the process which next followed the deodorizing. I do not believe that Congress had any such distinction in mind, and the Statute, as I read it, does not contemplate any such distinction. Plaintiff in its argument suggests that refiners do not refine oil for their health or for eleemosynary reasons, but rather refine it to produce articles intended for sale, which is exactly what refined oil is—an article intended for sale.

In case No. 47306, consolidated with this case for trial, plaintiff had on hand more than two million pounds of oil on which a first domestic processing had already taken place when Section 602½ became effective, and plaintiff insists in that case that only the first domestic processing in fact could be taxed. It seems to me that the question of what constitutes the first domestic processing is the same in both cases.

I am of the opinion that plaintiff is not entitled to recover under Count Three.

■ The Government also raises the question of limitations, and urges that in no event is plaintiff entitled to recover taxes paid prior to November 30th, 1935. That the claim filed on August 5th, 1938, in case No. 1921, shows that the sole ground of recovery there asserted is for "lost oil". That the claim of November 30th, 1939, which plaintiff contends also involves taxes in a substantial amount paid on and after November 29th, 1935, sets out three grounds of recovery as follows: "(1) Lost oil. (2) Extraneous matter not oil. (3) That the taxable process (where the oil was to be further used in the manufacture of food) was not the neutralizing process.

The Government insists that insofar as Counts One and Three involve payments made prior to November 29, 1935, the claim filed on August 1, 1938, was not broad enough to cover them; and that the claim filed on November 29, 1939, was too late to cover them, because at that time the statute of limitations had run and there was nothing to amend; and that in any event, after the claim had been once rejected, there was nothing to amend. On November 25th, 1938, the Commissioner first rejected the claim solely upon his interpretation of the Statute and of Article 5 of Regulation 48. On January 30th, 1940, plaintiff applied for a reconsideration of its claim, and on April 10th, 1940, after reconsidering it, as amended, the Commissioner rejected it on its merits without making any objection to the additional specifications made in the amendment.

Section 1103(a) of the Revenue Act of 1932, c. 209, 47 Stat. 169, Internal Revenue Code, Section 3772(a) (1), 26 U.S.C.A. Int. Rev.Code § 3772(a) (1), provides that no suit shall be maintained in any court for the recovery of any internal revenue tax " * * * until a claim for refund * * * has been duly filed with the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof; * * *."

Section 3313 Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code § 3313 (Section 3228(a) of the Revised Stats.) made applicable by Section 602½(f) of the Revenue Act of 1934, provides that all claims

650

for refund must be presented to the Commissioner of Internal Revenue within four years next after the payment of such tax, penalty, or sum.

Section 3791(a) (1) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code § 3791(a) (1), Section 1101 of the Revenue Act of 1926, authorizes the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to prescribe all needful rules and regulations for the enforcement of the Act. Article 19 of Regulation 48 provides that "all grounds in detail and all facts alleged in support of the claim must be clearly set forth under oath."

Plaintiff insists that recovery in the instant case is not asked of a greater or different sum than was set out in the original claim; that no new or additional items of tax have been added, and no new or unrelated grounds for recovery of the same have been set up. That the amount of the claim, as well as the grounds for recovery remain the same as those set out in the original claim; that plaintiff has not shifted its position to a totally new or different one; nor abandoned nor completely departed from its original claim for refund. United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L.Ed. 398; United States v. Garbutt Oil Co., 302 U. S. 528, 58 S.Ct. 320, 82 L.Ed. 405.

Plaintiff's original claim, filed on August 1, 1938, was based in part upon materials lost in the processing, and therefore not used in the production or manufacture of an article intended for sale, as defined in the Regulation. The revised or amended claim, filed on November 29, 1939, as I read it, merely amplifies the grounds previously set out, and specifies in detail and with particularity the nature of the lost material, emphasizing that all of the substances so lost were removed from the oil and lost before any use was made of the oil.

In United States v. Memphis Cotton Oil Company, 288 U.S. 62, 53 S.Ct. 278, 281, 77 L.Ed. 619, a claim for tax refund had been seasonably filed, but it failed to state the grounds upon which the refund was demanded. Before the claim was finally rejected, but subsequent to the time when a new claim would be barred by limitations, the original claim was amended by specifying the grounds therefor. In disposing of that claim the court said:

"The line of division must be kept a sharp one between the function of a statute requiring the presentation of a claim within a given period of time, and the function of a regulation making provision as to form. The function of the statute, like that of limitations generally, is to give protection against stale demands. The function of the regulation is to facilitate research. The Commissioner has the remedy in his own hands if the claim as presented is so indefinite as to cause embarrassment to him or to others in his Bureau. He may disallow the claim promptly for a departure from the rule. If, however, he holds it without action until the form has been corrected, and still more clearly if he hears it, and hears it on the merits, what is before him is not a double claim, but a claim single and indivisible, the new indissolubly welded into the structure of the old."

But even if the grounds set out specifically and in detail in the instant case could be considered as new grounds, the amendment would nevertheless be allowable. In Pink v. United States, 2 Cir., 105 F.2d 183, 187, the court said:

"Whether a new ground of recovery may be introduced after the statute has run by amending a pending claim filed in time depends upon the facts which an investigation of the original claim would disclose. Where the facts upon which the amendment is based would necessarily have been ascertained by the commissioner in determining the merits of the original claim, the amendment is proper. Bemis Bros. Bag Co. v. United States, 289 U.S. 28, 53 S.Ct. 454, 77 L.Ed. 1011; United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619; * * *. The rule is otherwise when the amendment requires the examination of new matters which would not have been disclosed by an investigation of the original claim. United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L.Ed. 398; United States v. Garbutt Oil Co., 302 U. S. 528, 58 S.Ct. 320, 82 L.Ed. 405; Marks v. United States, 2 Cir., 98 F.2d 564."

I am of the opinion that the facts set out in the amendment in the instant case could have been ascertained by the Commissioner in determining the merits of the original claim. This was no stale demand. The original claim had been filed in apt time. The amendment covered the

same claim but amplified the grounds for demanding the return of what plaintiff had all along been claiming as an over-payment of tax. The defense of the statute of limitations is not well taken, and plaintiff is not barred from presenting in detail the grounds upon which it seeks to recover.

Case No. 47306 presents the question of whether the tax imposed by Section 602½ of the Revenue Act of 1934, upon the first domestic processing of certain oils, applies only to the first domestic processing in fact; or whether, in the case of oils which previously to the effective date of the Statute had undergone a domestic processing, it applies to the first domestic processing after the effective date of the Act.

Subdivison (1) of Article 1 of the Regulations reads as follows: "(1) First domestic processing means the first use in the United States on or after the effective date of the Act. At all times in these regulations, the term 'processing' or 'first domestic processing' will be deemed to be synonymous with 'use' or 'first use in the United States on or after the effective date,' respectively, and will include the meanings implied in the latter terms by subdivision (k) above."

Section 602½ of the Revenue Act of 1934 imposed the tax upon "the first domestic processing" of certain vegetable oils and mixtures thereof, and defined the first domestic processing as "the first use in the United States, in the manufacture or production of an article intended for sale, of the article in respect to which the tax is imposed." This Act became effective on May 10th, 1934. Prior to that date the oils here involved had been imported by plaintiff in the crude state, and had been converted into different commercial products by being subjected, in the course of manufacture of articles intended for sale, to one or more domestic processings, all occurring prior to May 10th, 1934. To comply with Regulation 48, issued by the Commissioner of Internal Revenue, and approved by the Secretary of the Treasury on August 17th, 1934, plaintiff paid under protest the tax of $76,899.09 with respect to the first of such processings which occurred after the effective date of the statute. It then filed its claim for refund with the Collector, which claim was disallowed, whereupon plaintiff filed this suit.

Prior to May 10th, 1934, some of plaintiff's oil had been subjected to various of the processing operations. Some had been subjected to refining and bleaching, producing refined and bleached oil; some had been subjected to three of the processes, from which refined, dehydrated and bleached coconut oil was produced; and some had been subjected to a fourth process, resulting in refined, bleached, dehydrated and deodorized coconut oil.

All of the oils taxed under the Statute are imported oils. For many years prior to the imposition of the tax under Section 602½ there had been persistent agitation by the producers of domestic oils and fats for a tariff on foreign oils, as a protection against competition. The legislative history of Section 602½ clearly convinces me that it was the purpose of Congress to protect domestic farm products against competition from specified oils which were brought from outside the United States, by levying a tax on their first use within the United States. The Philippine Independence Act had been passed on March 24th, 1934, 48 U.S.C.A. § 1236(b), specifically authorizing the importation, free of duty, of a designated amount of coconut oil each year for a period of ten years, thus precluding Congress from placing an import duty thereon. Therefore, the amendments to subdivision (a) of Section 602½, as adopted, provided for (1) a surtax of two cents per pound on coconut oil of non-Philippine origin; and (2) provided for the segregation and payment into the Philippine treasury of the entire tax collected on Philippine coconut oil. Tracing the progress of the oil processing tax statute from its inception as Section 602 of the Revenue Act of 1934, to its final enactment as Section 602½ thereof, the Congressional debates and reports all evidence the same legislative purpose of protecting the American farmers' products against oils brought in from outside the United States. The debates show that it was the intention of Congress, in enacting Section 602½, to extend to foreign oils the same type of processing tax as had already been levied upon the American farmers' products by the Agricultural Adjustment Act, 7 U.S.C. A. § 601 et seq., and to use such tax as a substitute for a protective tariff. Congress also used the same taxing phraseology to levy the processing tax as it had used in the Agricultural Adjustment Act, and the Commissioner there interpreted the lan-

guage to mean "first in fact." I therefore do not believe that it is a reasonable interpretation of Section 602½ to construe the language there used as meaning "first after the effective date of the Act." Congressional Record, Vol. 78, pages 2513–2529; 2614–2658; 6308–6324–6314–6316–6380.

 Considering the fact of the derivative language of Section 602½ from the Agricultural Adjustment Act, and the administrative interpretation of the taxing phrase "first domestic processing" used in the Act then in effect, as meaning "first in fact", and the apparent adoption by Congress of that interpretation by defining the taxing phrase in Section 602½ to mean "the first use in the United States", without adding the further phrase "after the effective date of the Act" which phrase was supplied by the Commissioner in the Regulation, I believe it is clear that Congress intended to and did levy the tax under Section 602½ upon the first use of the imported oils after they reached the United States, with no thought of taxing any subsequent or later use thereof. In fact taxing any subsequent processing or use would not have achieved the protective purpose which Congress was seeking. In case No. 1921 (consolidated with case No. 47306 for trial) the Government insists that the neutralizing process is the taxable first domestic processing defined by the Statute.

In Armour & Company v. Harrison,[1] Northern District of Illinois, appeal dismissed, 7 Cir., 95 F.2d 993, a case which involved the interpretation of Section 602½, Judge Barnes, in his conclusions of law and findings of fact, disposing of the case, said:

"The first domestic processing, that is the first use in the United States in the manufacture of an article intended for sale, of any of the designated oils or combinations or mixtures, is the taxable transaction, the only taxable transaction; and where such first domestic processing has been done, whether before or after May 10, 1934, no act done thereafter to the oil or combination or mixture is 'the first domestic processing', the taxable transaction."

In Cincinnati Soap Company v. United States, D.C., 22 F.Supp. 141, 143, also interpreting Section 602½, the court said:

"Interpreting literally the language of the congressional definition of the taxable transaction, the assessment in the instant case is invalid; the oil having received its first domestic processing prior to May 10, 1934, but giving approval to the Commissioner's regulations, it has actual effect of taxing an additional domestic processing which Congress clearly did not intend when it used the language, 'with respect to any of which oils there has been no previous first domestic processing.'

"This language appears to be so plain, clear, and unambiguous as to require no further interpretation, but even if it were open to some question, this court feels bound by the unanimous decision of the Supreme Court in Gould v. Gould, 245 U.S. 151, at page 153, 38 S.Ct. 53, 62 L.Ed. 211, where it was held: 'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen.'

"If the clear and plain language of section 602½ standing alone would not bring the taxable transaction in the instant case within the provisions of the act, certainly, where the Commissioner's Regulations have the actual effect of so doing, said regulations to that extent cannot be sustained. While section 1101, Revenue Act of 1926, 26 U.S.C.A. § 1350 [26 U.S.C.A. Int.Rev. Code § 3791(a) (1)] authorizes the Commissioner to prescribe and publish all needful rules and regulations for the enforcement of the act, it does not and could not give him power to rewrite the law or to add to or take from the act, or subject to or relieve taxable transactions not intended by the Congress."

 In the instant case the result of the Commissioner's Regulation is to determine that the "first domestic processing" means the "first domestic processing on or after the effective date of the Act," which is not provided in the Act at all. The Act defines "first domestic processing" as follows: "For the purposes of this section the term 'first domestic processing' means the first use in the United States in the manufacture or production of an article in-

---

[1] No opinion for publication.

tended for sale, of the article with respect to which the tax is imposed, * * * or of any * * * quantity of coconut oil with respect to which oil there has been no previous first domestic processing." The Commissioner's determination that "first domestic processing" means the "first domestic processing after the effective date of the Act" is necessarily based on the Regulation issued by him, which in effect adds something to Section 602½ which the Congress did not include when it passed the law. The rule is that taxing statutes are to be applied in the usual and normal meaning of the language used, and are not to be extended by implication beyond the clear import of that language. And they are also to be strictly construed against the Government, and where any doubt exists, such doubt is to be resolved in favor of the taxpayer.

I am of the opinion that if Congress had intended to tax "the first domestic processing after the effective date of the Act" it would have so provided in plain words. I believe that where the oil in question had received its first domestic processing prior to May 10th, 1934, nothing done to it thereafter could in any sense have constituted "the first domestic processing" which Congress under Section 602½ made the taxable operation.

I have carefully read and considered the case of Colgate-Palmolive-Peet Company v. United States of America, 130 F.2d 913, decided by the Circuit Court of Appeals for the Third Circuit on March 31, 1942, where the court had under consideration the exact question involved in the instant case. The court there held that Congress intended to tax all oils, or combinations thereof, processed subsequent to the effective date of the Act. However I do not agree with the conclusion reached by that honorable court. I am convinced that Congress, when it used the phrase "first domestic processing" intended to and did levy the tax upon "the first domestic processing" in point of time, and, as the Circuit Court of Appeals said in the Colgate case, supra, "if we take the literal meaning of the word 'first,' we must concede that it means in advance of all others, the earliest."

The court therefore concludes that in case No. 1921, under Count One plaintiff is entitled to recover, the amount of the recovery to be determined either by stipulation of the parties, or by a further hearing in the matter.

Under Counts Two and Three in Case No. 1921, plaintiff is not entitled to recover.

In Case No. 47306 plaintiff is entitled to recover. Judgment may be entered accordingly.