**DURKEE FAMOUS FOODS, Inc., v. HARRISON, Collector of Internal Revenue (two cases).**

**Nos. 8171, 8172.**

Circuit Court of Appeals, Seventh Circuit.

June 1, 1943.

Samuel O. Clark, Jr., Sewall Key, and Alvin J. Rockwell, Asst. Attys. Gen., and J. Albert Woll, U. S. Atty., and Austin Hall, Asst. U. S. Atty., both of Chicago, Ill., for appellant.

Robert W. Childs and James F. Spoerri, both of Chicago, Ill., Roger Hinds, of New York City, John A. Duncan, of Cleveland, Ohio, and Mason Trowbridge, of Jersey City, N. J., for appellee.

Louis Quarles, of Milwaukee, Wis., amicus curiae.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These are cross appeals by Durkee Famous Foods, Inc. (hereinafter referred to as the plaintiff or taxpayer) and the Collector of Internal Revenue for the First District of Illinois (hereinafter referred to as the defendant or government) from a judgment entered by the District Court on

July 13, 1942. Two suits were instituted by plaintiff, one in July 1938 and the other in July 1940, for the recovery of taxes with respect to the processing of various oils during the period from May 1934 to January 1936, inclusive. The first suit sought recovery in the amount of $76,899.-09, which was allowed by the District Court, 46 F.Supp. 642. (This suit, originally numbered 47,306, is involved in appeal No. 8171, and will be referred to here by the latter designation.) The second suit was for recovery of taxes in the amount of $90,589.98. (This suit, originally numbered 1,921, is involved in appeal No. 8172, and will be referred to here by the latter designation.)

The complaint in the second suit alleged three grounds of recovery in counts designated 1, 2 and 3. The cases were consolidated and tried by the court. Plaintiff prevailed in appeal No. 8171, and judgment was rendered against the defendant for $76,899.09, with interest, and also prevailed as to count 1 in No. 8172 to the extent that judgment was rendered against the defendant in the amount of $10,721.41, with interest. In this case, counts 2 and 3 were dismissed. Defendant appeals from the judgment in No. 8171, and also from the judgment predicated upon count 1 in No. 8172. Plaintiff appeals from the limitation of recovery under count 1 (contending that it was entitled to recover in a greater amount), and from the dismissal of counts 2 and 3 in No. 8172.

Plaintiff, an Illinois corporation, was engaged during the period relevant to these appeals in extracting coconut oil from copra, which is the dried meat of coconuts, at its plants located in Portland, Oregon and Berkeley, California, and in the processing of coconut oil, palm kernel oil, sesame oil and sunflower oil at its plants located in Berkeley, California, Chicago, Illinois, Norwalk, Ohio, Louisville, Kentucky, and Elmhurst, New York. Plaintiff's grounds for recovery in each of the suits involve a construction of Sec. 602½ of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 778, upon which the taxes were assessed by and paid to the defendant. In No. 8171, the judgment of $76,899.09 was the total amount of taxes collected by the defendant. In No. 8172, the amount of taxes collected from plaintiff aggregated the sum of $5,374,551.15, the amount of recovery sought was $90,589.98, and judgment rendered for the plaintiff was in the amount of $10,721.41.

The parties have presented briefs and arguments as though there were two separate appeals. We shall accord like treatment, and first consider the question presented in No. 8171. The section of the Revenue Act in controversy, so far as pertinent to this appeal, provides: "There is hereby imposed upon the first domestic processing of coconut oil, sesame oil, palm oil, palm kernel oil, or sun-flower oil, or of any combination or mixture containing a substantial quantity of any one or more of such oils with respect to any of which oils there has been no previous first domestic processing, a tax of 3 cents per pound, to be paid by the processor. * * * For the purposes of this section the term 'first domestic processing' means the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed * * *."

On May 10, 1934, the date on which this section became effective, plaintiff had on hand in the United States 3,563,303 pounds of coconut oil, sunflower seed oil and sesame seed oil. All of such oils had been imported, and prior to said time had been subjected in the United States to one or more of the following processings, viz., neutralizing, washing, bleaching or deodorizing, and some of the oils had been subjected to a fifth processing—hydrogenation. Between the time the Act became effective and December 1, 1935, plaintiff further processed or used said oils in the manufacture or production of an article intended for sale, and paid, under protest, with respect to said further processing or usage, the taxes, recovery for which was sought and allowed in No. 8171.

The question for decision on this appeal is dependent solely upon the construction to be given the language, "there is hereby imposed upon the first domestic processing * * *." To be more specific, what was meant by the word "first"? It is plaintiff's contention, sustained by the lower court, that a tax could be legally levied only where the "first domestic processing" took place subsequent to the effective date of the Act, and, inasmuch as all the oils here involved had been subjected to at least one processing before the date of the Act, that a subsequent processing is not within the meaning of the Act, and, therefore, not subject to the tax. On the other hand,

it is the contention of the defendant that the "first domestic processing" means the first processing subsequent to the effective date of the Act, and this irrespective of the fact that one or more processings had occurred prior thereto.

Shortly after the Act became effective, there was promulgated under the Revenue Act of 1934, Treasury Regulations 48, which among other things provided: "First domestic processing means the first use in the United States on or after the effective date of the Act." This Regulation has been in effect at all times pertinent to the instant inquiry. Plaintiff argues that the Regulation does violence to the language of Congress in that it in effect amends the enactment by inserting the phrase "on or after the effective date of the Act," while the defendant insists that the Regulation is a proper interpretation of the statutory language.

That the question for decision is a difficult one is evidenced by the contrariety of views held by numerous courts which have given consideration thereto. It has been decided favorably to the government by two Courts of Appeals, the Second Circuit in Loose-Wiles Biscuit Co. v. Rasquin, 95 F.2d 438, and the Third Circuit in Colgate-Palmolive-Peet Co. v. United States, 130 F.2d 913. The difficulty which the court had in the latter case is disclosed by the fact that a second opinion was filed upon petition for rehearing, to which there was a vigorous dissent. The question has also been decided, favorably to the government but by a divided court, by the Court of Claims in Tasty Baking Co. v. United States, 38 F.Supp. 844, which followed the reasoning of the Loose-Wiles case. In Cincinnati Soap Co. v. United States, 22 F.Supp. 141, and in Armour & Co. of Delaware v. Harrison [1] (N.D.Ill.), decided July 14, 1937, decisions were reached favorable to the taxpayer (the latter decision by Judge Barnes). In addition, Judge Sullivan, who tried the instant case below, decided for the taxpayer and rendered a well reasoned opinion which evidences a careful study of the question (46 F.Supp. 642). It is interesting to note that Judge Sullivan refused to follow the reasoning of the Third Circuit in the Colgate case and that Judge Maris, who dissented in the latter case, quoted with approval the opinion of Judge Sullivan in the instant case.

It would unduly prolong this discussion and perhaps serve no useful purpose to undertake to analyze and distinguish the reasoning by which these various courts have arrived at opposite results. It seems pertinent, however, to make a few observations. The court in the Loose-Wiles case apparently gave no consideration to the legislative purpose or history of the Act, and predicated its decision on the reasonableness of the Treasury Regulation which interpreted the Act as the first domestic processing "on or after the effective date of the Act." It concluded that Congress by an amendment by the Revenue Act of 1936, § 702, 26 U.S.C.A. Int.Rev.Acts, page 779, approved this administrative interpretation. On the other hand, the court in the Colgate case denied the contention that Congress by the 1936 amendment had given such approval. The court in the latter case, in reaching a decision favorable to the government, relied upon what it designated as two "sign posts," (1) that the statute is presumed to operate on future Acts unless the contrary intent is declared, citing Hassett v. Welch, 303 U.S. 303, 58 S.Ct. 559, 82 L.Ed. 859, and (2) the Treasury Regulations interpreting the Act. It is pertinent to note that the government in the instant case strongly urges these two so-called "sign posts" as guides to the construction which it seeks.

It seems plain, however, that the rule of "prospective operation" affords no support to the government's contention. In the cases relied upon, as well as others which we have examined, the rule has been invoked in determining whether a statute was to be applied retroactively as distinguished from prospectively. That was true in Hassett v. Welch, supra, where the court construed an amendment to the Revenue Act relative to the estate tax imposed upon trusts. The government contended that the amendment was applicable to such trusts created prior to the enactment thereof. The court on page 307 of 303 U.S., on page 562 of 58 S.Ct., 82 L.Ed. 859, said: "We hold that the statutes are prospective in their operation and do not impose a tax in respect of past irrevocable transfers with reservation of a life interest." In the instant case, there is no question but that the statute is to be prospectively applied. The question is whether a second or third or some subsequent processing can

---

[1] No opinion for publication.

be designated as the "first domestic processing" and therefore the taxable event.

We think there is no room for legitimate argument but that a literal reading of the language employed by Congress supports plaintiff's position. It is difficult to conceive of plainer language than the "first domestic processing." According to the government, however, first means second or third or fourth. If Congress intended first after the effective date of the Act, it could easily have so stated. Not only did it fail to do this, but it later in the same section defined the term "first domestic processing" as meaning "the first use in the United States." Certainly the "first use" took place simultaneously with the "first processing," which in the instant case was prior to the effective date of the Act.

 This clear and unambiguous language calls for the application of another rule, long recognized by the courts but too often, we fear, honored only by lip service. In United States v. Standard Brewery, 251 U.S. 210, 217, 40 S.Ct. 139, 140, 64 L.Ed. 229, the court said: "Nothing is better settled than that in the construction of a law its meaning must first be sought in the language employed. If that be plain, it is the duty of the courts to enforce the law as written, provided it be within the constitutional authority of the legislative body which passed it." Again, in United States v. Merriam, 263 U.S. 179, 187, 44 S.Ct. 69, 71, 68 L.Ed. 240, 29 A.L. R. 1547, the court said: "But in statutes levying taxes the literal meaning of the words employed is most important, for such statutes are not to be extended by implication beyond the clear import of the language used." Again, in United States v. Missouri P. R. Co., 278 U.S. 269, 277, 49 S.Ct. 133, 136, 73 L.Ed. 322, the court said: "We are therefore bound by the words employed and are not at liberty to conjure up conditions to raise doubts in order that resort may be had to construction. * * * Construction may not be substituted for legislation."

Another rule often overlooked in construing a revenue statute is that in a doubtful situation the taxpayer is entitled to the benefit of the doubt. As was said by the court in United States v. Merriam, supra, 263 U.S. at page 188, 44 S.Ct. at page 71, 68 L.Ed. 240, 29 A.L.R. 1547: "If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer."

 Still another rule, wholesome in its nature, even though it bears the earmark of antiquity, is that laws are made by the legislative branch of the government and that both courts and administrative agencies are without authority to enlarge their scope. As was said in United States v. Standard Brewery, supra, 251 U. S. at page 219, 40 S.Ct. at page 141, 64 L. Ed. 229: "While entitled to respect, as such decisions (of the Internal Revenue Department) are, they cannot enlarge the meaning of a statute enacted by Congress." Apropos to the government's reliance in the instant case upon the Treasury Regulation which enlarged the legislative words by inserting "after the effective date of the Act," is the case of Miller v. Standard Nut Margarine Co., 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422. There, the Commissioner by regulation sought to extend the scope of a revenue provision placing a tax upon oleomargarine. The statutory definition included "vegetable-oil annotto." The Commissioner issued regulations in which the quoted phrase appeared as "vegetable oil, annotto," thereby extending the statutory definition of oleomargarine to include the product of the plaintiff in that suit. The court held the regulation invalid, stating on page 508 of 284 U.S., on page 262 of 52 S.Ct., 76 L.Ed. 422: "Regulations promulgated under the act omit the hyphen and add a comma thus making the phrase to read 'vegetable oil, annotto.' The Commissioner's determination that respondent's product is oleomargarine necessarily was based on that version. It is elementary that tax laws are to be interpreted liberally in favor of taxpayers and that words defining things to be taxed may not be extended beyond their clear import. Doubts must be resolved against the government and in favor of taxpayers."

 It seems that the regulation relied upon in the instant case enlarges the statutory language to an extent even greater than the regulation condemned in the Miller case. Congress having imposed the tax upon the "first domestic processing," the administrative agency proceeded by regulation to broaden the legislative enactment so as to provide for its imposition, not only upon the "first processing" but any subsequent processing which occurred first after the effective date of the Act.

■ It seems that much of the confusion incident to the numerous attempts to construe Sec. 602½ is due to a failure to appraise its legislative history properly. True, a mere reading of the section immediately raises a doubt as to why Congress should impose a tax only upon the "first domestic processing" when there was a large amount of oil on hand which had theretofore been subjected to one or more processings. This doubt arises, notwithstanding the plain language which Congress employed. A study of the legislative history, however, dispels the doubt and discloses the purpose which Congress sought to achieve. At this point, we note a statement in defendant's brief: "Section 602½ is a revenue measure and was intended to produce substantial amounts of money for the support of the Federal Government." Upon this premise, erroneous so we think, much of its argument is predicated. The legislative history demonstrates beyond controversy that the section was designed solely for the purpose of protecting the American farmer against imports of oils designated in the Act. Revenue was merely an incident to this main objective. The Act itself as to coconut oil expressly provides, "All taxes collected under this section with respect to coconut oil wholly of Philippine production or produced from materials wholly of Philippine growth or production, shall be held as a separate fund and paid to the Treasury of the Philippine Islands * * *." Certainly that portion of the tax was not "for the support of the Federal Government."

■ This legislative history has been discussed to some extent in the Colgate case, 3 Cir., 130 F.2d 913. Furthermore, it has been aptly described in the opinion of the District Court [46 F.Supp. 651] in the instant case, and we adopt that portion of the opinion. It follows:

"All of the oils taxed under the Statute are imported oils. For many years prior to the imposition of the tax under Section 602½ there had been persistent agitation by the producers of domestic oils and fats for a tariff on foreign oils, as a protection against competition. The legislative history of Section 602½ clearly convinces me that it was the purpose of Congress to protect domestic farm products against competition from specified oils which were brought from outside the United States, by levying a tax on their first use within the United States. The Philippine Independence Act had been passed on March 24th, 1934, 48 U.S.C.A. 1236(b) specifically authorizing the importation, free of duty, of a designated amount of coconut oil each year for a period of ten years, thus precluding Congress from placing an import duty thereon. Therefore, the amendments to subdivision (a) of Section 602½, as adopted, provided for (1) a surtax of two cents per pound on coconut oil of non-Philippine origin; and (2) provided for the segregation and payment into the Philippine treasury of the entire tax collected on Philippine coconut oil. Tracing the progress of the oil processing tax statute from its inception as Section 602 of the Revenue Act of 1934, to its final enactment as Section 602½ thereof, the Congressional debates and reports all evidence the same legislative purpose of protecting the American farmers' products against oils brought in from outside the United States. The debates show that it was the intention of Congress in enacting Section 602½, to extend to foreign oils the same type of processing tax as had already been levied upon the American farmers' products by the Agricultural Adjustment Act, * * * and to use such tax as a substitute for a protective tariff. Congress also used the same taxing phraseology to levy the processing tax as it had used in the Agricultural Adjustment Act, and the Commissioner there interpreted the language to mean 'first in fact'. I therefore do not believe that it is a reasonable interpretation of Section 602½ to construe the language there used as meaning 'first after the effective date of the Act'. Congressional Record, Vol. 78, pages 2513-2529; 2614-2658; 6308-6324-6314-6316-6380.

"Considering the fact of the derivative language of Section 602½ from the Agricultural Adjustment Act, and the administrative interpretation of the taxing phrase 'first domestic processing' used in the Act then in effect, as meaning 'first in fact', and the apparent adoption by Congress of that interpretation by defining the taxing phrase in Section 602½ to mean 'the first use in the United States', without adding the further phrase 'after the effective date of the Act' which phrase was supplied by the Commissioner in the Regulation, I believe it is clear that Congress intended to and did levy the tax under Section 602½ upon the first use of the imported oils after they reached the United States, with no thought of taxing any sub-

sequent or later use thereof. In fact taxing any subsequent processing or use would not have achieved the protective purpose which Congress was seeking."

The Third Circuit in the Colgate case recognized that the provisions of Sec. 602½ were derived largely from Sec. 9(a) of the Agricultural Adjustment Act, 7 U. S.C.A. § 609(a). The latter Act, previously passed by the same Congress, provided: "* * * The processing tax shall be levied, assessed, and collected upon the first domestic processing of the commodity, whether of domestic production or imported, and shall be paid by the processor. * * *" It will be observed that the taxable event in each Act was precisely the same, that is, "the first domestic processing." There was promulgated by the Treasury Department, in connection with the Agricultural Adjustment Act, Article 7 of Regulation 81 which, as amended September 20, 1933, provided: "When the first domestic processing begins before the effective date, no tax attaches, although it is not completed until after the effective date."

■ Thus, at the time of the enactment of Sec. 602½, Congress not only employed exactly the same phraseology as it had previously employed in the other Act, but had before it the administrative regulation which relieved the processor from tax where the processing had been completed or commenced prior to the effective date of the law. The court in the Colgate case [130 F.2d 915] stated, "If the provisions of Sections 9(a) and 602½ are deemed to be in pari materia, the two sections should be interpreted similarly." With that statement we agree and are of the view that the two provisions were in precisely that situation. That court, however, reasoned that the two sections could not be so considered for the reason that Congress in the Agricultural Adjustment Act provided what was designated as a floor tax upon commodities theretofore processed, and that because no similar provision was contained in the Revenue Act of 1934 the two provisions cannot be deemed to be in pari materia. We disagree with this reasoning. It ignores the purpose sought by the Act under consideration, as shown by its legislative history.

As already shown, Congress was attempting to protect the farmer from competition with imported oils largely from the Philippines. By reason of the Phil-ippine Independence Act, 48 U.S.C.A. § 1231 et seq. it was precluded from placing an import duty on such oils. It sought to accomplish the same objective by imposing a tax upon the "first processing," defined as the "first use in the United States." The imposition of the floor tax upon oil already processed would have been no aid in the accomplishment of the desired purpose. The revenue feature of both the Act under consideration and the Agricultural Adjustment Act was purely incidental and not for the benefit of the Federal Government. In the former, the taxes on coconut oil were to be segregated in the Treasury and paid to the Philippine Islands. In the Agricultural Adjustment Act, the taxes were to be segregated and paid to the American farmer as benefits. Furthermore, the effect of the construction sought by the government as applied to the instant situation would come close to imposing a floor tax by regulation. The fact that Congress, after imposing a floor tax in the Agricultural Act, made no such provision in the instant Act, is also a significant circumstance that Congress did not intend that a tax should be imposed upon the designated oils processed prior to the enactment.

■ The government, in support of Treasury Regulation 48, urges that Congress gave its approval thereto by numerous subsequent amendments, and particularly that of 1936. It is not seriously contended, however, that the subsequent amendments other than that of 1936 have any bearing upon the situation. As heretofore stated, the court in the Loose-Wiles case accepted the government's view in this respect, while the court in the Colgate case rejected it. Our study of this amendment leads us to the conclusion that it affords little, if any, aid to the construction sought by the government. True, the taxable event was described as the "first domestic processing," as it had been in the Act of 1934. This may be some indication that Congress approved the Regulation definition of the word "first," as meaning the first processing after the effective date of the Act. However, there is language in the amendment which we regard as inconsistent with an intention on the part of Congress to subscribe to the Regulation interpretation.

The amendment, among other things, provides two exemption clauses, (1) respecting certain fatty acids and salts, and

(2) certain mixtures and combinations. Clause (1) was conditioned on "a previous first domestic processing taxed under this section," while clause (2) was conditioned on "a previous first domestic processing." The difference in the phraseology of clauses (1) and (2) appears to indicate a recognition of two classes of first domestic processing, (1) taxed, and (2) not taxed. This is inconsistent with the government's theory, which calls for the imposition of the tax on every first domestic processing. This is so for the reason that every processing subsequent to the date of the Act is designated as a "first" processing. On the other hand, according to plaintiff's theory, the tax is imposed only where the first processing takes place as a matter of fact subsequent to the date of the Act. Where the first processing, however, has taken place prior to the Act, no tax is imposed. Thus, according to plaintiff's theory, there are two classes of first domestic processing, one taxed and the other not taxed.

Another circumstance, so we think, which militates against the theory of Congressional approval of the Regulation is that the Act was two years old at the time of the passage of the amendment of 1936. By that time, the oil on hand in May 1934 had no doubt been used, and the construction placed upon the word "first" had lost its significance.

We, therefore, are of the view that the court below correctly decided the issue involved in this appeal.

Appeal No. 8172 involves a claim for refund of a part of the taxes paid by plaintiff with respect to the processing of some 172,000,000 pounds of coconut oil, palm kernel oil, and sesame oil during the period July 1934 to January 1936, inclusive. The issues arising on this appeal appear to require a further statement as to the facts. As already stated, plaintiff in the production of refined oils engages in a number of processings, of which the first is known as the neutralizing process. All of the oils involved in this suit were subjected, in addition to the neutralizing process, to the processes of washing and bleaching, and some were subjected to further processes. Taxes were paid upon the total weight of the oil which entered the first domestic processing, that is, as applied to these oils,

the neutralizing process. A part of the total quantity of these oils thus processed was sold by plaintiff at the end of the bleaching process, to manufacturers of pharmaceuticals, cosmetics and soaps. The remainder of such oils was subjected by the taxpayer to a fourth operation, known as the deodorizing process. A portion of the oils subjected to the latter process was sold to manufacturers of food products, and the remainder was further processed by plaintiff in the preparation of margarine, shortening, and a hard butter for the confectionery trade.

As extracted from copra, palm kernels and sesame seed respectively, these oils customarily contain a small percentage of fiber, hair, sand, moisture, etc., known collectively as the M. I. U. content.[2] They also contain free fatty acids in quantities ranging from five to six percent in the case of coconut oil and palm kernel oil, to about one percent in the case of sesame oil. In the neutralizing process, most of the free fatty acids, together with about 55% of the so-called M. I. U. content, is separated and removed. The remaining 45% of the M. I. U. content, consisting of unsaponifiable substances such as alcohol, resinous matter, gums, etc., remains in the oil throughout the succeeding processes and is sold to the ultimate consumer. Traces of free fatty acids also remain in the oil during the subsequent processes.

During the neutralizing process, as well as during the washing, bleaching and deodorizing processes, there occur losses of oil. Such oil in small quantities settles out with the free fatty acids, sticks to the sides of the vat, drains out through leaky valves, is carried away with the water during the washing process, is absorbed by the bleaching ingredient during the bleaching process, or is carried away with the steam during the deodorizing process. The amount of the oil lost during these processes varies with the efficiency of the operations.

As already stated, the complaint in this case consisted of three counts. Under count (1), it was alleged that the taxes were improperly measured to include the M. I. U. content which was removed during the neutralizing process. Under count (2), it was alleged that the taxes were improperly measured to include oil, fatty acids, glyc-

---

[2] M. stands for moisture, I. insoluble impurities, and U. the unsaponifiables, which include alcohols, higher alcohols, gum, and resinous matter.

erol and coloring matter, which were lost during the processing operations. Under count (3), it was alleged that, as applied to the oils which were further processed by the taxpayer in the preparation of food products, the taxable "first domestic processing" was not the neutralizing process but was the first processing following the deodorizing process.

As heretofore noted, the court found for the taxpayer under count (1), and for the Collector under counts (2) and (3). According to plaintiff's bill of particulars, .21% of the weight of the oils entering the neutralizing process consisted of M. I. U., which was removed by that operation. Following the decision that plaintiff was entitled to a refund under count (1), this percentage was accepted by the defendant for the purpose of computing the judgment under this count. Such computation amounted to $10,721.41, for which judgment was allowed. The court also dismissed counts (2) and (3). Plaintiff appeals from such judgment of dismissal, and defendant appeals from the judgment against it entered under count (1).

At this point, we observe that subsequent to the court's decision, or at any rate subsequent to the court's announcement as to what its decision would be, plaintiff sought to amend the bill of particulars which it had furnished prior to the commencement of the trial, and its complaint, if necessary, so as to include in counts (1) and (2) the free fatty acids. The court's denial of leave to amend is claimed to have been erroneous. The court also decided against the government's contention that plaintiff's claim for refund was insufficient to provide a sufficient basis in law for recovery. In view of the conclusion which we have reached as subsequently stated, we think it is unnecessary to set forth the facts relevant to the decision of the District Judge, either as to its refusal to allow plaintiff to amend or that the claim for refund was insufficient.

In this appeal, as in No. 8171, a decision of the questions presented involves a construction of Sec. 602½ of the Revenue Act of 1934. In contrast to the question involved in that appeal, all of the acts of processing in the instant appeal took place after the date of the statutory enactment. Also, the questions presented in the instant case have not, so far as we are advised, been decided by any court other than the one below.

The questions raised on this appeal, insofar as they relate to the merits of the taxpayer's various contentions, must be dependent upon what Congress fixed as the taxable event. By the plain provision of the Act, the tax is imposed upon the "first domestic processing of coconut oil, sesame oil, palm oil, palm kernel oil or sunflower oil, or any combination or mixture containing a substantial quantity of any one or more of such oils." It is important to keep in mind that the tax is not laid upon oil, but upon the "first domestic processing" thereof. As already shown, numerous processes are employed in the manufacture of the finished product, that is, refined oil. Among these numerous processes, there is no question but that the "first domestic processing" is the neutralizing process, and it would appear that there could be no reasonable question but that this is the taxable event. However, the statutory definition that "the term first domestic processing means the first use in the United States, in the manufacture or production of an article intended for sale" furnishes the premise upon which plaintiff's contention under count (3), and under count (2) to a lesser extent, is predicated.

◼ The argument is advanced that plaintiff is entitled to a refund based upon oil lost during the various acts of processing, upon the ground that such oil could not have been used. Further, it is argued that oils which were designed for the manufacture of oleomargarine and kindred products by the taxpayer were not intended for sale until they were processed into such manufactured articles. Such argument, in our opinion, is without merit. A construction consistent therewith would impute to Congress the purpose of providing a taxable event dependent upon the intention of the processor. For instance, if the processor intended to sell the refined oil, the taxable event would be the "first processing," but if he intended to use it for further manufacture, the taxable event would be the last rather than the "first processing" which Congress prescribed. The record discloses that there was some domestic processing for domestic use of the oils designated in the statute. It seems reasonable to conclude that Congress by the qualifying language employed intended that there should be no tax upon the processing of oil for such use. Moreover, "the first use" as used in the statutory definition evidently relates to the article produced as

a result of the "first processing." Certainly, when Congress fixed the taxable event as the "first domestic processing," it did not intend to destroy the event by the qualifying language employed in defining the event. Such would be the result, however, if the taxpayer's contention be accepted. Otherwise, the tax base would be in a state of flux, depending upon how much oil was lost, and whether the processor intended the processed article for sale or for further use in manufacture.

▇ It is fair to note that plaintiff concedes that its position with reference to its claim under count (3) is inconsistent with its contention in appeal No. 8171. In that case, we have sustained its contention that it was not liable for the tax because the "first domestic processing" took place prior to the effective date of the Act. The same reasoning here requires us to hold that the tax is imposed upon the "first domestic. processing" and that such processing is the "first use." It follows that the liability of the taxpayer became definite and fixed at that time and was not subject to change, by reason of subsequent developments. It also follows that it is not entitled to any refund on account of lost oil or the removal of fatty acids or any other extraneous ingredients as a result of subsequent processing.

Defendant's attack upon the court's action in sustaining plaintiff's contention under count (1) presents, in our judgment, the most difficult question involved in these appeals. It is the contention of the government that the tax is measured upon the total quantity of oil which enters the first domestic processing, including all the elements which the designated oils contain in their natural or crude state. Taxes were paid by the plaintiff upon this basis. Its claim for refund is for that portion of the taxes predicated upon the M. I. U. and fatty ingredients which were removed during this first processing. The question, so we think, must be determined largely by the meaning of the word "oil" as used in the Act, always keeping in mind that the tax is upon the first domestic processing and not the oil itself. While the tax is laid upon the processing, its measure must necessarily be determined by the oil processed. Does that mean the oil in its natural or crude state upon which the act of processing is performed, or does it mean the oil which results from this first processing? In this respect, the lower court stated: "If Congress had intended that the tax should be assessed upon the oil plus the extraneous matter, I believe it would have used the term 'crude oil' rather than coconut oil, palm oil, etc., as it did; just as I believe that if the Commissioner had intended to include the extraneous material in the measure of the tax, he would also have used the term 'crude oil' rather than 'oil' as it appears in Regulation 48 which defines the measure of the tax. Moreover, 'processing' is defined in the Statute itself as meaning 'the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed.' It is nowhere suggested that M. I. U. is ever the subject of use of any kind, nor is it possible to subject it to any use, as that term is defined in either the Statute or the Regulation."

We are unable to agree with the court's reasoning in this respect. As heretofore stated, it is our view that "the first use in the United States" takes place and is coextensive with the "first domestic processing." That is the first use of the designated oils, and it is that use or processing which constitutes the taxable event, providing of course the processing results in the production of "an article intended for sale." Undoubtedly, the article intended for sale is the oil which results from the processing. The tax, however, is laid upon the act of processing and not upon the article produced thereby. The tax not being laid upon that which results from the act of processing, it appears that it should not be measured thereby. Consistent with this. thought, we think it must be measured by the oil as it exists at the time it enters the act of processing.

▇ We doubt if the meaning of the Act would have been any less free from. ambiguity if Congress had employed the term "crude oil," as suggested by the lower court. If it had intended that the tax be measured by the amount of the finished product—refined oil—it certainly would. not have imposed the tax upon the "first domestic processing," for the reason that refined oil does not result from this first processing but results only after numerous. subsequent processings. If it had been intended that the tax be measured by the finished article, it appears reasonable to. think that the taxable event would have been the last processing rather than the first. It would seem to follow that by

making the "first domestic processing" the taxable event, it was intended that the tax be measured by the amount of crude oil. It is certain that it was not intended that it be measured by the amount of refined oil.[3]

Sec. 602½ was amended in 1936. (We have discussed this amendment in appeal No. 8171.) By this amendment, the tax was imposed not only upon the oils mentioned in the original Act but upon "fatty acids derived from any of the foregoing oils." It is argued that this was a recognition by Congress that the tax had not been imposed upon such fatty acids in the Act of 1934 and should be excluded in measuring the tax under that Act. This amendment, however, also provided that the tax should not apply to any fatty acids resulting from a previous first domestic processing "taxed under this Section." This also appears to be a clear recognition that some fatty acids had been and some had not been taxed by reason of a previous first domestic processing. As pointed out in our discussion in appeal No. 8171, we are of the view that Congress intended to distinguish between a "first domestic processing" which occurred prior to the effective date of the Act and one which occurred subsequently. In the former event, no tax had been imposed, while in the latter it had. We do not think there is anything in the 1936 amendment which aids the construction sought by plaintiff.

■ The court below also stressed a ruling of the Treasury Department announced in 1935 (S.T. 808, XIV-1, Cum. Bull. 396) which provided that "the elimination of dirt from crude oil by filtering or clarifying with bone char or fuller's earth, or similar agents, was not a taxable processing of the oil under the statute." It is thus reasoned that this ruling was a recognition by the Treasury Department that the dirt eliminated from crude oil was not to be included in the measure of the tax and that it would follow that the M. I. U. content and the fatty acids removed during the "first domestic processing" should also be eliminated. It must be kept in mind, however, that the Treasury Department did not recognize "filtering or clarifying with bone char or fuller's earth" as a processing. They were merely methods sometimes employed for removing certain extraneous matters. All parties to this appeal recognize and agree that the "first domestic processing" within the contemplation of the statute was the neutralizing process. Under these circumstances, as we view the situation, the position taken by the Treasury Department with reference to the elimination of dirt by a method which all parties concede was not the taxable event is not of persuasive force.

It is, therefore, our conclusion that plaintiff was not entitled to recover any part of the amount claimed in this appeal. Its tax was paid upon the total poundage which entered and was a part of the "first domestic processing," which was the proper measure of the tax.

The judgment of the District Court in appeal No. 8171 is affirmed. The judgment in appeal No. 8172 is affirmed, except that part in favor of the plaintiff predicated upon count (1) of the complaint, and, as to that, it is reversed.

KERNER, Circuit Judge (dissenting).
I dissent in appeal No. 8171.

---

[3] The facts in this case fortify our view that the oils designated in the Act were those in their natural or crude state. According to the claim for refund, 36,491,875 pounds of material were subject to the first domestic processing, of which 35,762,038 pounds were actually oil, which means that there were 729,837 pounds of ingredients other than actual oil. In other words, only about 2% of the total poundage which entered the first processing was something other than oil. Congress no doubt had knowledge of the very small percentage of waste material contained in the oils designated and, therefore, found no reason to exclude such waste material from the basis for calculating the tax.