**GLIDDEN CO. v. UNITED STATES.**

**No. 10417.**

Circuit Court of Appeals, Sixth Circuit.

June 5, 1947.

John A. Duncan, of Cleveland, Ohio, and Roger Hinds, of New York City (M. B. & H. H. Johnson, and John A. Duncan, all of Cleveland, Ohio, and Roger Hinds, of New York City, on the brief), for appellant.

Louise Foster, of Washington, D. C. (Sewall Key, Lee A. Jackson, and Frederic G. Rita, all of Washington, D. C., and Don C. Miller, and Francis B. Kavanagh, both of Cleveland, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The corporate taxpayer has appealed from the judgment of the district court dismissing its action to recover $50,970.57, with interest, alleged to have been illegally assessed and collected as processing taxes by the United States. The statute under which the controversy arises, section 602½ of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 778, provides in relevant part, as follows: "There is hereby imposed upon the first domestic processing of coconut oil, sesame oil, palm oil, palm kernel oil, or sunflower oil, or of any combination or mixture containing a substantial quantity of any one or more of such oils with respect to any of which oils there has been no previous first domestic processing, a tax of 3 cents per

pound, to be paid by the processor. * * * For the purposes of this section the term 'first domestic processing' means the first use in the United States, in the manufacture or production of an article intended for sale, of the article with respect to which the tax is imposed * * *."

The district court based decision upon the authority of Durkee Famous Foods v. Harrison, 7 Cir., 136 F.2d 303. The facts are not in dispute, and are detailed in the elaborate findings of fact of the district court. The substantial content of these 53 numbered findings is set forth in the margin. [1]

The appellant taxpayer contends that the weight of the moisture and inert, insoluble impurities in the oil should not have been

---

[1] On February 20, 1940, the taxpayer filed a claim for refund for $83,121.65 as the amount of the taxes claimed to have been erroneously computed and illegally collected. On April 20, 1940, this claim for refund was rejected by the Commissioner of Internal Revenue.

Between March 31, 1936, and August 31, 1937, plaintiff paid to the Collector of Internal Revenue at Cleveland, Ohio, as taxes pursuant to section 602½ of the Revenue Act of 1934 the aggregate sum of $2,908,424.96, in monthly payments. The taxes paid, as aforesaid, were computed at the rate of three cents per pound on 93,867,021 pounds of material, and at the rate of five cents per pound on 1,931,802 pounds of material, less certain credits.

The materials upon which these taxes were computed and paid were known to the trade as crude oils of the following types: crude coconut oil, crude palm oil, and crude palm kernel oil. Such crude oils ordinarily contain, and did in this case contain, certain non-oleaginous, inert and unsaponifiable matter, consisting of water, fibre, hair, threads, bran, sand, hulls, meal, wax and alcohol, collectively known as the M. I. U. content of such crude oils, and also free fatty acids, glycerol and coloring matter, all of which substances are associated with, but none of which substances are chemically combined with, the oil.

That part of the claim based on unsaponifiable substances (the "U" in the M. I. U.) was withdrawn by the taxpayer because it was conceded that these substances were not removed from the oil in the processing thereof. The total M. I. content of the various crude oils (that is the moisture and inert insoluble impurities), was 201,178 pounds, consisting of water, fibre, hair, threads, bran, sand, hulls, meal, wax, alcohol and other non-oleaginous and inert substances, all of which were separated and removed from the crude oil in the first processing operation.

In addition to the M. I., there was a loss of oil in each of the processing operations aggregating 1.54% of the total of 95,798,823 pounds of crude oils: .64% was lost in the neutralizing operation; .30% in the washing operation; .23% in the bleaching operation; and .37% in the deodorizing operation, making a total of 1.54%, or 1,475,302 pounds lost in the four operations.

The total free fatty acid content of the various crude oils was in excess of 5%.

39,496,094 pounds of the refined oil produced from the above crude oils were not sold, but were used by plaintiff in its manufacture of oleomargarine, candy fillers, and other food products.

Of the 201,178 pounds of moisture and inert insoluble impurities removed in the first processing operation, 82,942 pounds had been associated with oil which was not sold but was used by the taxpayer in its manufacture of oleomargarine, candy fillers, and other food products.

Of the 1,475,302 pounds of material which was lost in the four processing operations, 608,240 pounds had been associated with oil which was not sold but was used by the taxpayer in its manufacture of the above-mentioned products.

The term "oil" is used in the trades and industries and in the laboratory in the same sense as in ordinary parlance. The term "oil" is used in a different sense from the term "crude oil".

The term "crude oil" as used in the trade and in the laboratory means a natural conglomerate of oil and substances which are not oil, such as inert insoluble impurities and moisture.

The crude oil upon the processing of which these taxes were fixed and collected contained the above-mentioned "M. I. U.", and also free fatty acids.

The term "oil" as used in the trade and in the laboratory means the oil itself and does not include the M. I. U.

Oil is one of the constituents of crude oil. The free fatty acids and other foreign substances which are not oil are present with the oil in the crude oil.

The terms "coconut oil", "palm oil", and "palm kernel oil", as used in both the trade and the laboratory, mean the same as the term "oil".

The terms "crude coconut oil", "crude palm oil", and "crude palm kernel oil", as used in both the trade and the laboratory, mean the pure oil together with the associated impurities referred to as the

included in the measure of the tax under section 602½ of the Revenue Act of 1934 upon the domestic processing of coconut oil, palm oil and palm kernel oil, "defined in the statute as its '* * * first use in the United States, in the manufacture or pro-

"M. I. U.", together with the free fatty acids.

Moisture, the free fatty acids. and the inert insoluble impurities (dirt) are not oil, either in the trade sense or in the laboratory sense of the word "oil". Neither are they processed as oil.

When coconut oil, palm oil, and palm kernel oil are specified in the trade, the specification refers to the oils themselves without the associated moisture and impurities, and not to the crude oils.

In the trade specifications established by the National Institute of Oilseed Products, the specification of crude palm oil as not containing more than 5% free fatty acids expressly characterizes said palm oil as "crude palm oil", and provides that "all moisture and impurities shall be allowed to buyers by sellers.

Oil in the crude state is the same as oil in the refined state, though in the crude state the oil is associated with certain foreign substances, the M. I. U., and the free fatty acids; but the oil itself in the crude oil is the same as the oil in the refined oil.

The taxpayer is, and was during the period involved in this suit, engaged in several different industries, including the refining of oil and the use of oil in the refined state in the manufacture of oleomargarine.

During said period, the taxpayer engaged in the refining of oil at its refineries in Berkeley, California; Elston Avenue, Chicago; Elmhurst, N. Y.; and Louisville, Kentucky.

Oleomargarine is a manufactured substance consisting of a base of refined vegetable oil, approximately 80%. This base is blended with milk solids, cultured by bacteria, emulsified, solidified by chilling. Salt to the extent of about 3% is added; and the product is molded into prints in which form it is usually sold. The taxpayer engaged in the manufacture of this product at Norwalk, Ohio; Iron Street, Chicago; and Berkeley, California.

Taxpayer's oil refinery at Berkeley is (as required by federal regulation) physically separated from its oleomargarine factory at Berkeley by a solid wall made of concrete and brick, with no communication through the wall.

The taxpayer does not, and did not during the period involved, engage in any oil refining in any of its oleomargarine factories; and did not engage in the manufacture of oleomargarine in any of its oil refineries.

Before taxpayer acquired its oil refineries at Louisville, Kentucky, and Elston Avenue, Chicago, its predecessors had engaged in the refining of oil there and had sold this oil in the refined state to various purchasers, including manufacturers of oleomargarine and including itself.

Its oil refineries at Elmhurst, N. Y., and Berkeley, California, were built by the taxpayer.

Before it acquired its oleomargarine plants at Norwalk, Ohio, and Iron Street, Chicago, the taxpayer's predecessors had engaged in the manufacture of oleomargarine there, and had purchased refined oil for that purpose from various refiners of oil, including taxpayer, itself.

Its oleomargarine plant at Berkeley was built by the taxpayer.

After it acquired or built its several oil refineries, the taxpayer continued to use a portion of the product in its own manufacture of oleomargarine, and to sell a portion of said product to other concerns, including other manufacturers of oleomargarine.

The taxpayer, after acquiring or building its several oleomargarine plants, continued to obtain some of the refined oil from its own oil refineries, and to purchase the balance of said oil from other concerns.

The business of refining vegetable oil and the business of using oil as an ingredient in the manufacture of oleomargarine are separate industries, although some concerns, including the taxpayer's, are engaged in both of these separate industries.

The taxpayer has never used any of its crude oils in any of its refineries in the manufacture or production of oleomargarine, or engaged in the production of oleomargarine at any of its refineries.

Prior to the taxpayer's use of the oil involved in this suit in the manufacture of oleomargarine, the moisture and impurities and the free fatty acids had already been removed, and the losses of oil itself in the several refining operations had already been sustained; yet the amount of the M. I., and the free fatty acids, and the oil lost in the refining operations, was included in the computation of the processing tax paid on such oil.

The products of taxpayer's oil refineries were refined coconut oil, refined palm oil, and refined palm kernel oil.

The product of taxpayer's oleomargarine plants was oleomargarine in which refined oil was used as an ingredient.

A portion of the refined oil produced

duction of an article intended for sale.'" It is insisted, also, that the weight of the oil which is lost in processing is not "used" and should not have been included in the measure of the tax.

█ Appellant argues that dirt and water, not being oil, are not processed as such; and that, in order to affirm the judgment below, it would be necessary for us to hold that by the term "oil" as used in the taxing statute Congress had reference to "crude" oil rather than to oil in the sense which distinguishes it from dirt, water and other foreign substances mixed with it.

The rejoinder of the government is that the terms "coconut oil", "palm kernel oil", and "sesame oil", as used in the statute, must be read in the context of the taxable event, which is the "first domestic processing"; that the tax is imposed, not on the "oil", but upon the "processing" and is to be measured by the quantity of oil which enters the taxable processing; and that, if Congress had chosen to measure the tax by the oil resulting from the first domestic processing, it would have expressly said so.

The same argument made by appellant was properly rejected, we think, in Durkee Famous Foods v. Harrison, supra, where the Court of Appeals said, at pages 311-313 of 136 F.2d of the opinion: "By the plain provision of the Act, the tax is imposed upon the 'first domestic processing of coconut oil, sesame oil, palm oil, palm kernel oil or sunflower oil, or any combination or mixture containing a substantial quantity of any one or more of such oils.' It is important to keep in mind that the tax is not laid upon oil, but upon the 'first domestic processing' thereof. As already shown, numerous processes are employed in the manufacture of the finished product, that is, refined oil. Among these numerous processes, there is no question but that the 'first domestic processing' is the neutralizing process, and it would appear that there could be no reasonable question but that this is the taxable event. * * * As heretofore stated, it is our view that 'the first use in the United States' takes place and is coextensive with the 'first domestic processing.' That is the first use of the designated oils, and it is that use or processing which constitutes the taxable event, providing of course the processing results in the production of 'an article intended for sale.' Undoubtedly, the article intended for sale is the oil which results from the processing. The tax, however, is laid upon the act of processing and not upon the article produced thereby. The tax not being laid upon that which results from the act of processing, it appears that it should not be measured thereby. Consistent with this thought, we think it must be measured by the oil as it exists at the time it enters the

by the taxpayer was an article intended for sale to other concerns; another portion of the refined oil produced by it was not an article intended for sale, but was an article intended for use, and actually used, in the taxpayer's own manufacture of oleomargarine in its own factories. All the above facts are identical with the facts in Durkee Famous Foods, Inc. v. Harrison, Collector, 7 Cir., 136 F.2d 303. However, the following further facts were developed in the testimony in this case, for which there was no counterpart in the Durkee case. The taxpayer knew, at each one of its refineries in advance of processing any crude oil, how much of the refined oil was to be sold as such, and how much was to be used in its own manufacture of oleomargarine.

Throughout the period, each of taxpayer's oil refineries and each of its oleomargarine factories were operated, and their records kept, as though they were separate concerns, as several of them had been at one time, and not merely separate divisions of the corporate taxpayer.

During the period involved in this action, the managers of the taxpayer's oil refineries negotiated with the managers of its oleomargarine factories with respect to the acquisition and use of oil in its refined state for the manufacture of oleomargarine just as though they had been managers of separate concerns; and the records of such transactions included invoices and the quoting of market prices between the refinery and the factory, just as though they had been separate concerns.

During the period involved, the manager of each oil refinery was required to ascertain as nearly as possible, and as far in advance of its production as possible, the quantity which was to be sold to other concerns and the quantity which was to be used by it in its own further manufacture of oleomargarine.

act of processing. We doubt if the meaning of the Act would have been any less free from ambiguity if Congress had employed the term 'crude oil', as suggested by the lower court. If it had intended that the tax be measured by the amount of the finished product—refined oil—it certainly would not have imposed the tax upon the 'first domestic processing,' for the reason that refined oil does not result from this first processing but results only after numerous subsequent processings. If it had been intended that the tax be measured by the finished article, it appears reasonable to think that the taxable event would have been the last processing rather than the first. It would seem to follow that by making the 'first domestic processing' the taxable event, it was intended that the tax be measured by the amount of crude oil. It is certain that it was not intended that it be measured by the amount of refined oil."

We could add nothing elucidating to the sound rationale of the Seventh Circuit Court of Appeals. We are not impressed, as appellant insists we should be, with the meaning of the word "oil", as used in trade or in the laboratory. Definitions of the word in dictionaries or legal lexicons are likewise unimportant here. Our concern is to determine, by a practical approach, what Congress meant when it imposed a tax upon the "first domestic processing" of the varieties of "oil" mentioned in the Act. It would be a strained construction to say that, by omission of the adjective "crude" in the Act of Congress, the national legislature meant to impose a processing tax only on refined oil. In sum total, the argument of appellant seems to border upon the splitting of hairs.

■ Next, appellant argues that the amendment of section 602½ of the Revenue Act of 1934 by the Revenue Act of 1936, ch. 690, section 702, 49 Stat. 1742, 26 U.S. C.A. Int.Rev.Acts, page 955, to include fatty acids and salts derived from the taxable oils to the measure of the tax necessarily implies that fatty acids had not been included in the measure of the tax prior to the amendment. We are unable to agree with the contention. The amendment expressly provided that the tax imposed under the section shall not apply with respect to any fatty acid or salt resulting from a previous first domestic processing taxed under the section. The report of the Senate Committee indicates that the purpose of the proviso was "to avoid double taxation". S. Rep. No. 2156, 74th Cong. 2d Sess., p. 30 [1939-1 Cum. Bull. (Part 2) 678, 698.] It would seem from the proviso that Congress understood that all fatty acids "resulting from a previous first domestic processing taxed under this section" would already have been subjected to a tax.

■ Finally, appellant urges that "since the trial court has found that the 39,496,094 pounds of refined oil that was used, later on at a different place, in the manufacture of oleomargarine was not 'an article intended for sale', the use of appellant's oil in producing those 39,496,094 pounds of refined oil was not a taxable use; and the taxable use was the later 'first use' in making oleomargarine." As was said by the Seventh Circuit Court of Appeals in rejecting this same contention, such construction "would impute to Congress the purpose of providing a taxable event dependent upon the intention of the processor." The point was thus reasoned: "For instance, if the processor intended to sell the refined oil, the taxable event would be the 'first processing,' but if he intended to use it for further manufacture, the taxable event would be the last rather than the 'first processing' which Congress prescribed. The record discloses that there was some domestic processing for domestic use of the oils designated in the statute. It seems reasonable to conclude that Congress by the qualifying language employed intended that there should be no tax upon the processing of oil for such use. Moreover, 'the first use' as used in the statutory definition evidently relates to the article produced as a result of the 'first processing'. Certainly, when Congress fixed the taxable event as the 'first domestic processing,' it did not intend to destroy the event by the qualifying language employed in defining the event. Such would be the result, however, if the taxpayer's contention be accepted. Otherwise, the tax base would be in a state of flux, depending upon

how much oil was lost, and whether the processor intended the processed article for sale or for further use in manufacture." [136 F.2d 311, 312.]

In conclusion, we should state that we deem this case identical in principle with the Durkee case from the Seventh Circuit, and would have regarded it sufficient to affirm on simple order, upon the authority of the opinion in that case, except for the fact that appellant with much labored effort has vigorously attacked that opinion. We are in thorough accord with the decision and the reasoning of the Seventh Circuit Court of Appeals.

The judgment of the district court is affirmed.