**CHARLES LEICH & CO.**

v.

**UNITED STATES.**

No. 10898.

United States Court of Appeals Seventh Circuit.

Feb. 26, 1954.

Henry B. Walker, Jr., Robert D. Londergan, Henry B. Walker, Jr., Evansville, Ind., for plaintiff-appellant.

Hon. H. Brian Holland, Asst. Atty. Gen., Harry Marselli, Atty., U. S. Department of Justice, Washington, D. C., Jack C. Brown, U. S. Atty., Indianapolis, Ind., Ellis N. Slack, Melva M. Graney, Sp. Assts. to the Atty. Gen., for appellee.

Before MAJOR, Chief Judge, DUFFY and SWAIM, Circuit Judges.

DUFFY, Circuit Judge.

This is an action for a refund of excess profits taxes and interest paid for the fiscal year ended April 30, 1942. The facts were stipulated. The district court found the issues favorable to the government.

The questions presented for determination are: (1) whether for the purpose of computing taxpayer's invested capital under § 718, Internal Revenue Code, 26 U.S.C.A. § 718, for excess profits tax purposes for the fiscal year ended April 30, 1942, taxpayer's invested capital should be reduced by the fair market value (as taxpayer contends) or by the cost (as the government contends) of property taxpayer exchanged in prior years for shares of its own stock which it thereafter retired; (2) whether taxpayer's exchange of common stock of H. A. Woods, Inc. and Gillis Drug Company on January 11, 1932, for stock of Woods-Gillis Corporation was accomplished pursuant to a plan of reorganization as defined in § 112(i)(1) of the Revenue Act of 1932,[1] and that the exchange then made came within the scope of § 112(b)(3) of that Act,[2] so that there would ·be no recognizable loss to plaintiff on the transaction; and (3) whether the Commissioner correctly allocated taxpayer's basis on the H. A. Woods, Inc. and Gillis Drug Company common stock as between the Woods-Gillis preferred and common stock received on the January 11, 1932, exchange.

Prior to January 1, 1926, several members of the Leich family, as a partnership, had conducted a wholesale drug business at Evansville, Indiana, under the firm name Charles Leich and Company. As of January 1, 1926, the partnership acquired all of the capital stock (250 shares par value $100) of H. A. Woods Drug Company, which operated certain retail drug stores in Evansville. In July, 1927, the name of the company purchased was changed to H. A. Woods, Inc.

On September 1, 1928, the partnership was succeeded by a corporation, Charles Leich and Company, the plaintiff herein, which had an authorized capitalization of 2,500 shares of 6% cumulative preferred $100 par value stock, and 15,000

---

1. 26 U.S.C.A.Int.Rev.Acts, p. 513, Act of 1932, § 112(i) (1).

2. 26 U.S.C.A.Int.Rev.Acts, p. 511, Act of 1932, § 112(b) (3).

shares of no par value common stock. For the assets of the partnership plaintiff issued 10,000 shares of its common stock. Included in the assets was the common stock of H. A. Woods, Inc. which on September 1, 1928, had a basis in the hands of plaintiff of $204,671.41.

On February 18, 1929, plaintiff altered and enlarged its capital structure to 75,000 shares of common no par value stock, and 5,000 shares of 7% cumulative, Series A or Series B, preferred $100 par value stock. As of March 5, 1929, plaintiff issued 40,000 shares of its new no par common stock in exchange for 10,000 shares of its old no par common stock, and it made sales of its new stock to underwriters, as follows:

| | |
|---|---:|
| 12,511 shares common stock. | $127,900.00 |
| 2,221 shares of series A 7% preferred at par, less discount | 203,174.00 |
| | $331,074.00 |

The plaintiff used the proceeds thereof in part as follows:

| | |
|---|---:|
| Redemption of 194 shares of its old 6% preferred, then outstanding | $ 20,176.00 |
| Acquisition of Cline-Vick retail drug stores operated in Illinois | 183,781.61 |
| Acquisition of Wilhelm Drug Co. retail drug store at Carbondale, Illinois, for cash | 12,836.19 |
| Liquidation of purchase money obligations upon stock of H. A. Woods, Inc. | 83,535.45 |
| Total | $300,327.25 |

The purchase price of Cline-Vick retail stores was paid for as follows:

| | |
|---|---:|
| Cash, including expenses of acquisition | $103,294.11 |
| 482 shares of plaintiff's 7% Series A preferred stock | 48,200.00 |
| 3,583 shares of plaintiff's common stock | 32,287.50 |
| Total | $183,781.61 |

Previously, in September, 1928, plaintiff had acquired the Van Trees Drug Company store for $7,134.86 and also the Meyer Drug Company store #3 for $7,844.85. In the same month the plaintiff transferred these two stores to H. A. Woods, Inc., as a contribution to the latter's capital surplus in the sum of $14,979.71.

On or about March 5, 1929, plaintiff transferred to H. A. Woods, Inc. the Cline-Vick stores and the Wilhelm store as contributions to the transferee's capital surplus. Such contributions were entered in the books of H. A. Woods, Inc., in the same amounts they had previously been entered on plaintiff's books, viz., Cline-Vick stores, $183,781.61, and Wilhelm store $12,836.19.

As of May 1, 1929, plaintiff acquired the entire issue of 750 shares of common stock, par value $100 per share, of Gillis Drug Company which operated retail drug stores in Terre Haute, Indiana. For this common stock the plaintiff paid $167,938.85. The outstanding preferred stock of Gillis Drug Company (154 shares of the par value of $100 each), was not affected by the plaintiff's purchase. Plaintiff paid the purchase price as follows:

| | |
|---|---:|
| Cash, a series of notes and legal fees in connection with acquisition | $ 97,538.85 |
| 704 shares of plaintiff's 7% Series B preferred stock, par value $100 each | 70,400.00 |
| | $167,938.85 |

In order to accomplish the purchase of the 750 shares of common stock of Gillis Drug Company, and for other reasons, the plaintiff, at the time of the purchase, sold 10,583 shares of its common stock without par value for $106,787.50.

The operation of the Cline-Vick stores was unprofitable and they were sold on August 15, 1931, by H. A. Woods, Inc. to Cline-Vick Drug Company, a new corporation in which plaintiff had no interest. As consideration Woods received

482 shares of plaintiff's Series A preferred stock, and 3,583 shares of plaintiff's common stock. This stock received by Woods, and then having an aggregate fair market value of $50,000, was immediately turned over to the plaintiff and held by it until December 31, 1931, when it was cancelled.

As of December 31, 1931, the issued and outstanding capital stock of H. A. Woods, Inc., all of which was owned by the plaintiff, consisted of 250 shares of $100 par value common stock, and it was agreed that as of that date it had a basis to plaintiff of $369,011.45.

As of December 31, 1931, the issued and outstanding capital stock of Gillis Drug Company consisted of 154 shares of $100 par value 8% preferred, none of which was owned by plaintiff, and 750 shares of $100 par value common stock having a basis to plaintiff of $167,938.85.

The business affairs of plaintiff and its subsidiaries had been going badly. Plaintiff found increasing sales resistance from its retail customers because of the retail competition of plaintiff's subsidiaries, and the subsidiaries found it difficult to get reasonable terms from other wholesalers because of their connection with the plaintiff. Plaintiff decided to dispose of its two retail subsidiaries. On December 28, 1931, plaintiff adopted a plan with a view of divesting itself of any common stock interest in the retail drug business.

The steps to carry out the plan were taken on January 11, 1932. There was a sale of assets of H. A. Woods, Inc. to Gillis Drug Company (by change of name Woods-Gillis Corporation), and the payment therefor of 2,500 shares of Woods-Gillis no par common stock. H. A. Woods, Inc. dissolved and distributed 2,500 shares of Woods-Gillis stock to plaintiff, its sole stockholder. In addition Woods-Gillis exchanged 154 shares of its preferred stock to holders of 154 shares of preferred stock of Gillis Drug Company. It also issued to plaintiff 2,500 shares of $7 cumulative preferred no par value stock redeemable upon 30 days notice at $100 per share, and 2,500

shares of no par common stock in exchange for 750 shares of (old) Gillis common stock. The final step in the plan was that plaintiff entered into an escrow agreement to sell to H. A. Woods the 5,000 shares of Woods-Gillis common stock providing for certain contingencies under which the stock was to be transferred and delivered to plaintiff as its absolute property. However plaintiff agreed that if and when Woods-Gillis redeemed or otherwise retired its preferred stock, the escrow agent should deliver the 5,000 shares to Woods to become his personal property. Woods gave plaintiff his promissory note for $1,000.

The new capital stock issued by Woods-Gillis under the plan was set up on its books as follows:

| | |
|---|---:|
| 154 shares 8% preferred, $100 par | $ 15,400.00 |
| 2,500 shares $7 preferred, no par | 223,600.00 |
| 5,000 shares common, no par.. | 1,000.00 |
| Stock | $240,000.00 |
| Surplus | 17,501.33 |
| Total | $257,501.33 |

At the conclusion of the transaction stated, there was in existence a new retail company, Woods-Gillis Corporation, owning the former assets and owing the former debts and liabilities of H. A. Woods, Inc. and Gillis Drug Company. Its stock was held as follows: 154 shares of new preferred held by the former holders of Gillis preferred; 2,500 shares of $7 cumulative preferred, no par, stock held by plaintiff; and 5,000 shares of common stock held by H. A. Woods individually, but subject to the escrow agreement.

Prior to January 11, 1932, H. A. Woods, Inc. and Gillis Drug Company had identical boards of directors, consisting of 8 members. Prior to October 5, 1931, 7 of the members were also members of plaintiff's 9-member board. In its federal corporation income tax return for the calendar year 1932, plaintiff reported nothing as to gain or loss by

reason of the January 11, 1932 transaction.

in October and December, 1932, plaintiff exchanged 37½ shares of Woods-Gillis Corporation $7 preferred stock for 37½ shares of its own Series B preferred stock, which stock was then retired.

In January, 1933, Woods-Gillis Corporation sold its stores in Terre Haute and as part of the consideration received 516½ shares of plaintiff's Series B preferred stock, and 125 shares of Woods-Gillis 8% preferred (old Gillis preferred). On February 22, 1933, the name Woods-Gillis Corporation was changed to H. A. Woods Drug Company, Inc., hereinafter referred to as "Woods Company." As of April 1, 1934, Woods Company satisfied a debt of $27,503.30 owing to plaintiff from the operation of the Terre Haute stores. Plaintiff received in payment 516½ shares of its own preferred stock, Series B. These shares were transferred on August 30, 1934, and plaintiff retired same on that date.

During 1933 and 1934 the financial condition of both plaintiff and the Woods Company became more precarious. The fact that plaintiff continued to hold preferred stock in Woods Company still presented the problem of unfriendliness toward plaintiff by independent drug dealers and also the unwillingness of other wholesale druggists to extend credit to a retailer in whom plaintiff had a financial interest. It became apparent that a complete severance of the wholesale business from the retail business was necessary. Finally as of August 30, 1934, as a last resort, a plan was adopted and carried out to remedy the situation.

To set forth all the details of the plan would unduly extend this necessarily lengthy statement of facts. Suffice it to say that the plan called for a reorganization of the Woods Company, including a reduction of its authorized capital stock to 795 shares of Class A $7 preferred no par stock, and 1,400 shares of its Class B stock. The entire 795 shares of the Woods Company new Class A preferred, and 636 shares of its new Class B stock were exchanged for the old 2,-462½ shares of the preferred stock of the Woods Company, held by plaintiff. The remaining 764 shares of the Class B stock were exchanged for the 5,000 shares of its old common stock, held by H. A. Woods individually, and the escrow agreement was thereupon terminated. Scrip was issued by the Woods Company to plaintiff for $25,042.50 in liquidation of an indebtedness of like amount.

To acquire 636 shares of its own preferred stock, plaintiff agreed to exchange for each such share, 6 shares of plaintiff's no par common, 1¼ shares of proposed Woods Class A, and 1 share of proposed Woods Class B stock. This required 3,816 shares of plaintiff's no par common, and such stock was contributed by members of the Leich family.

On August 30, 1934, plaintiff retired 621 shares of its own Series A preferred and 15 shares of its own Series B preferred which it had received in the transactions effective as of that date. The capital structure of plaintiff was changed to 954 shares of 7% preferred stock, par value $100, and 75,000 no par value common. The cost basis to plaintiff of the Woods Company stock was determined by the Commissioner to be $526,541.35, while the fair market value of said stock was $9,540.00.

The excess profits tax is a tax which was imposed by Congress in addition to the regular income tax on corporations. It applies "to all corporate profits and gains over and above what Congress deemed to be a fair and normal return for the corporate business taxed." Commissioner of Internal Revenue v. South Texas Co., 333 U.S. 496, 497, 68 S.Ct. 695, 697, 92 L.Ed. 831. Two methods are provided to determine what would be normal profits. The first permits a deduction of an amount equal to the corporation's average net income during the base period from 1936 to 1939. The second (used by taxpayer) permits a deduction equal to 8% of the taxpayer's invested capital for the taxable year. § 714, Internal Revenue Code,

as added by § 201, Second Revenue Act of 1940, 54 Stat. 974, and amended by § 201, Revenue Act of 1941, 55 Stat. 687, 26 U.S.C.A. § 714. As was stated in the South Texas case, Congress intended to impose the excess profits tax on all annual net income in excess of 8% of a corporation's working capital, including its accumulated profits.

In § 718, Internal Revenue Code, as added by § 201, Second Revenue Act of 1940, 54 Stat. 974, 26 U.S.C.A. § 718, Congress defined how equity invested capital should be computed. It specified what shall be included in and what shall be deducted from equity invested capital. The amount of such capital is to be reduced by, among other things, "Distributions made prior to such taxable year which were not out of accumulated earnings and profits." § 718(b) (1). It is this provision for the reduction of equity invested capital which is the focal point of the controversy in the present case. The statute provides, "The term 'distribution' means a distribution by a corporation to its shareholders, * * *." § 718(c) (1).

Sec. 718(b) (1) does not state the amount by which the distribution of property representing equity invested capital shall be considered to reduce equity invested capital when such property has appreciated or depreciated in value by the time of the distribution. Taxpayer contends that the property goes out of equity invested capital at its fair market value at the time of distribution. The government contends, and the district court so held, that it goes out at its cost basis—the same amount at which it was included in equity invested capital.

Ignoring for the moment the complicated maze of stock exchanges and other transactions between plaintiff and the various other companies, we have a situation where plaintiff, a wholesale drug concern, invested in retail drug stores which proved to be a bad investment. By transactions consummated on January 11, 1932, plaintiff divested itself of all common stock interest in its subsidiaries which operated the retail stores. On August 30, 1934, plaintiff divested itself of its preferred stock interest in such companies. That plaintiff had a legitimate business interest in separating its wholesale operations entirely from the retail drug business is indisputable.

In maintaining that the transaction carried out by it on August 30, 1934, was not a distribution in partial liquidation under § 115(i), Internal Revenue Code, 26 U.S.C.A. § 715(i), and that its invested capital should be reduced by a fair market value of the property transferred on August 30, 1934, plaintiff relies upon Treas.Reg. 109, § 30.718–5: "The purchase by a corporation of its own stock for investment does not of itself result in a reduction of invested capital. * * * If, however, the corporation subsequently cancels such stock, invested capital is reduced, beginning with the day following such cancellation, by so much of the adjusted basis of such stock in the hands of the corporation as is not properly chargeable to earnings and profits of the taxable year. If stock is purchased for retirement, there is a distribution on the date of purchase of the amount paid therefor and the invested capital is reduced by the amount thereof not properly chargeable to earnings and profits of the taxable year." Plaintiff emphasizes that this regulation gives a like treatment to equity invested capital in dealing with both "stock subsequently cancelled" and "stock purchased for retirement."

Plaintiff also places reliance upon another section of the same regulation: "The amount of distribution by a corporation whether in bonds of such corporation, or in money or other property may exceed the amount of the equity invested capital computed without regard to such distributions. In such event, the equity invested capital of such corporation shall be reduced by virtue of such distributions to a *negative* amount." Plaintiff argues that if the contention of the government is correct, to wit, that equity invested capital must always be

reduced by the cost thereof, then the last sentence of the part of the regulation just quoted has no meaning whatsoever. Quite logically, plaintiff says that only when the "amount of distribution" is computed by the use of the fair market value of the assets distributed can there occur a situation where this paragraph of the regulation has any effect.

If Congress had intended that reduction of equity invested capital should always be in the amount of cost at the time of acquisition, it could easily and simply have provided that such capital should be the total cost basis of all the assets. Instead § 718 provides, among other things, that all of the property paid in for stock should first be included, and this amount should then be reduced by the amount of distributions not made out of earnings and profits. It is reasonable to assume that Congress intended to allow a fair and reasonable return on the original investment in the business. Although plaintiff's assets (stock representing retail stores) had greatly depreciated in value, there was by reason thereof no change in the equity invested capital account. It is stated in Mertens, Law of Federal Income Taxation, 1943 Ed., Vol. 7A, § 42.110, p. 571: "The earnings and profits of the current year do not figure in invested capital for that year and purchases of property with existing corporate funds have no effect. Similarly, the write-down of assets on the books of the corporation does not affect invested capital, and sales of property have no direct effect, but do affect invested capital to the extent that the resulting gain or loss is reflected in earnings and profits account."

Let us assume that an asset of a corporation is represented in invested capital at a cost basis of $100,000 and over the years depreciates in value to worthlessness. Under any reasonable interpretation of the Act, it should make no difference whether the asset is retained by the corporation and the equity invested capital remains unchanged; whether the asset is abandoned and equity invested capital remains unchanged;

or whether the asset is "distributed" to the stockholders and the equity invested capital is reduced by zero. The stockholders paid in $100,000 as risk capital and are entitled to a fair return based on the capital they invested, whether it has since increased or decreased in value. However, if stockholders received a return of capital through the distribution of appreciated assets, then to the extent of the market value of the assets thus received the stockholders no longer have that amount invested in the corporation, and it is reasonable to provide that invested capital should be reduced by the fair market value of the assets distributed. Such conclusion is consistent with Treas.Reg. 109, § 30.718–5 which refers to equity invested capital being reduced by distributions to a negative amount.

The statute is silent whether equity invested capital should be reduced by the fair market value or the cost basis of the property distributed.

■ The words of the statute are thus open to construction. "If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer." United States v. Merriam, 263 U.S. 179, 188, 44 S.Ct. 69, 71, 68 L.Ed. 240. And, as was stated by this court in Durkee Famous Foods, Inc., v. Harrison, 136 F.2d 303, 307, "Another rule often overlooked in construing a revenue statute is that in a doubtful situation the taxpayer is entitled to the benefit of the doubt." See also: United States v. Updike, 281 U.S. 489, 496, 50 S.Ct. 367, 74 L.Ed. 984.

■ The government relies on Reynolds Spring Co. v. Commissioner, 6 Cir., 181 F.2d 638, approved without opinion in Stone & Webster, Inc. v. Pedrick, 2 Cir., 187 F.2d 488. Plaintiff argues that the Reynolds case was wrongly decided, but that in any event it is inapposite because of the difference in the facts in that case and those in the case at bar. We do not think the difference in facts justifies a different result, but with due deference we think the Reynolds case was wrongly decided. We hold that in computing the equity invested capital of

plaintiff for excess profits tax purposes for the fiscal year ended April 30, 1942, the invested capital of plaintiff should be reduced by the fair market value of the property transferred by plaintiff on August 30, 1934.

We do not reach the question of allocation of the cost basis of assets transferred by plaintiff on January 11, 1932. Nor need we discuss the point argued at length by the parties as to whether the transaction carried out by plaintiff on January 11, 1932, was accomplished pursuant to a plan of reorganization as defined in § 112(i) (1) of the Revenue Act of 1932, and that the exchange of stocks by plaintiff brought the transaction within § 112(b) (3) of the Act.

The judgment of the district court will be reversed and remanded with directions to enter judgment for the plaintiff on the basis set forth in this opinion.

Reversed.